The STATE OF NEW YORK, Plaintiff,

v.

The UNITED STATES of America; Caspar W. Weinberger as Secretary of Defense; and Verne Orr, as Secretary of the Air Force, Defendants.

No. CV 82–2228.

United States District Court,
E.D. New York.

Oct. 8, 1985.

Robert Abrams, Atty. Gen. of the State of N.Y., Norman Spiegel, Nancy Stearns, Asst. Attys. Gen., New York City, for plaintiff.

Raymond J. Dearie, U.S. Atty., E.D. of N.Y., Thomas Battistoni, Asst. U.S. Atty., Brooklyn, N.Y., for defendants; John L. Wittenborn, George B. Henderson, Attys., U.S. Dept. of Justice, of counsel.

Memorandum of Decision and Order

MISHLER, District Judge.

## I. FACTS

Plaintiff, the State of New York, has brought this suit against the United States of America, Caspar Weinberger (Secretary of Defense) and Verne Orr (Secretary of the Air Force) to redress wrongs allegedly committed by defendants against New York State, its citizens and its residents. Defendants allegedly committed these wrongs through "chemical contamination of the groundwaters underlying former Suffolk County Air Force Base and the surrounding area and [through] the threat of further contamination posed to the groundwaters and surface waters of New York State." (Amended Comp. ¶ 1).

From approximately March 27, 1951 to March 31, 1971, defendants operated and controlled the Suffolk County Air Force Base at what is now known as the Suffolk County Airport. After March 31, 1971, defendants transferred ownership of the airbase to Suffolk County, although they still retained possession and control of seventy acres of the airbase for use by New York Air National Guard, 106th Airspace Rescue and Recovery Group. (*Id.* ¶ 9, 11–12).

South and downgradient of the airport are residential areas, which are bordered by Quantuck Creek on the east; Aspatuck Creek on the west; and Quantuck Bay on the south. Plaintiff alleges that all three of these bodies of water are navigable waters rich in marine life. (*Id.* ¶ 18).

Plaintiff claims that over a period exceeding ten years, defendants spilled, leaked or discharged large quantities of military jet fuel known as JP4 as well as other chemicals into the ground at Suffolk County Airport. Specifically, plaintiff makes the following allegations:

(1) "[B]eginning in the late 1950's or early 1960's, a leak in the hydrant system that channeled JP4 jet fuel from the storage

tanks to the aircraft at the Suffolk County Airport resulted in discharge of military jet fuel into the soil" until repaired in the fall of 1962 (*Id.* at ¶ 20–21);

(2) In 1967, during a cleaning of the storage tanks, tens of thousands of gallons of jet fuel entered the soil (*Id.* ¶ 23–26);

(3) In February, 1974, while fuel was being transferred from one storage tank to another, more than 10,000 gallons of JP4 was discharged into the soil (*Id.* ¶ 28–29);

(4) From 1957 to the present, during military firefighting exercises, jet fuel, hydraulic fluid, drain oil and other chemicals, which were "not consumed [by] fire were left in [a] pit and soaked into the soil" (*Id.* ¶ 31–33);

(5) Until April 1, 1971, defendants operated a Nondestructive Inspection Laboratory "where hazardous chemicals, including dye penetrants, degreasers and acids were used for examining aircraft structures and components for flaws"; when no longer useable, these chemicals were stored temporarily in a lime filled pit from which the chemicals leaked into the soil (*Id.* ¶ 34–36); and

(6) Defendants disposed of "significant quantities" of contaminated jet fuel, carbon tetrachloride, and other "hazardous chemicals" into a landfill near the airport (*Id.* ¶ 37–41).

In 1977, hydrocarbon and fuel contaminants were found in residential water wells on Peters Lane located south and downgradient from the airport. Due to potential health hazards, Suffolk County installed a water main in this area to provide the residents with a safe source of drinking water. (*Id.* ¶ 43–45).

In 1982, "significant concentrations" of JP4 jet fuel were discovered in groundwater monitoring wells located south and downgradient from the airport. In addition, hydrocarbon contaminants were found in a well on Fairview Avenue, located south of Peters Lane. Suffolk County Health Department advised residents in this area to cease using their private wells. (*Id.* ¶ 46–49).

## II. *Legal Claims and Requested Relief*

It is this contamination and pollution allegedly caused by the foregoing events and emanating from Suffolk County Airport that forms the factual basis for plaintiff's complaint. As for the legal underpinnings of plaintiff's complaint, it sets forth nine causes of action, the first and ninth of which are expressly premised upon federal statutes. Under the first cause of action, defendants' "handling, storage, disposal and discharge of JP4 jet fuel and other hazardous chemicals and fail[ure] to remove them from the soil" purportedly violates § 13 of the Rivers and Harbors Act, 33 U.S.C. § 407 and § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). (*Id.* ¶ 55–56). Under the ninth cause of action (or what is in actuality the second denominated eighth cause of action in the amended complaint), defendants are allegedly strictly liable to plaintiff for resultant damages to the "land, wildlife, biota, groundwater and other natural resources" and for "all costs and expenses incurred or to be incurred by the State of New York for the removal, remediation and response to the contamination" at and around the airport under § 107(a) of the Comprehensive Environmental Response Compensation and Liability Act of 1980 (CERCLA), 42 U.S.C. § 9607(a). (*Id.* ¶ 82–83). The other seven causes of action are explicitly grounded on state law as follows: strict liability in tort (second cause of action—¶ 57–62); negligent creation of a continuing public nuisance (third cause of action—¶ 63–67); negligent maintenance of a continuing public nuisance (third cause of action—¶ 68–71); intentional maintenance of a continuing public nuisance (fifth cause of action—¶ 72–75); violation of general prohibition against water pollution under New York's Environment Conservation Law (ECL) § 17–0501 (sixth cause of action—¶ 76–77); violation of ECL § 17–1743 by failing to notify the Department of Environmental Conservation of the 1974 spill of JP4 fuel (seventh cause of action—¶ 78–79); and violation of ECL § 17–0503 by permitting hazardous substances to "enter the

soil and thereby leak into the waters of a Marine District" (eighth cause of action—¶ 80–81).

Jurisdiction is asserted under the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 2671 *et seq.*, the Clean Water Act, 33 U.S.C. § 1365; CERCLA, 42 U.S.C. § 9601 *et seq.* and 28 U.S.C. § 1331(a).

As for relief, plaintiff seeks the following:

(1) That defendants be required to remove the jet fuel and other contaminants referred to in this Complaint from the soil and groundwater beneath and down gradient from the Suffolk County Airport and return the site to its ecological condition prior to the spills and discharges of JP4 jet fuel and other hazardous chemicals.

(2) That defendants provide safe drinking water to any person whose well has been or becomes contaminated from jet fuel or other hazardous chemicals referred to in this complaint; or

(3) That defendants be liable to the State of New York for the actual costs of removing or neutralizing the jet fuel and other hazardous chemicals in this complaint referred to; and

(4) That defendants be fined in the amount as provided by law for each day of violation of New York Environmental Conservation Law and the Clean Water Act; and

(5) That defendants reimburse the State of New York for all damages sustained and to be sustained to the natural resources of the State and for all the costs and expenses incurred or to be incurred by the State of New York for remediation and response to the contamination at and in the environs of the Suffolk County Airport as allowed by Section 107(a)(2)(A)(B) of CERCLA, 42 U.S.C. § 9607(a) [; and]

(6) For such other and further relief that this Court deems just and proper.

(Amended Comp. p. 20–21).

Defendants now move to dismiss the amended complaint pursuant to Fed.R. Civ.P. 12(b) for lack of subject matter juris-

diction and/or failure to state a claim upon which relief can be granted. Alternatively they seek judgment on the pleadings under Fed.R.Civ.P. 12(c) or summary judgment under Fed.R.Civ.P. 56. Defendants have submitted affidavits and exhibits in support of their motion, which was submitted without oral argument. Since matters outside the pleadings have been presented and are presently considered by the court, this motion is treated as one for summary judgment. Fed.R.Civ.P. 12(b).

## III.  DISCUSSION

### A.  *Summary Judgment Standard of Review*

We set out the general principles governing summary judgment motions. The moving party has the burden of establishing the absence of a genuine issue of fact. Fed.R.Civ.P. 56(c). *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 1608, 26 L.Ed.2d 142 (1970); *Katz v. Goodyear Tire & Rubber Co.,* 737 F.2d 238, 244 (2d Cir.1984); *United States v. One Tintoretto Painting,* 691 F.2d 603, 606 (2d Cir. 1982). That burden includes the presentation by the moving party of such " 'evidence on which, taken by itself, it would be entitled to a directed verdict.' " *Donnelly v. Guion,* 467 F.2d 290, 293 (2d Cir.1972) (quoting *Radio City Music Hall Corp. v. United States,* 135 F.2d 715, 718 (2d Cir. 1943)). Furthermore, the movant's burden can only be established "on the basis of admissible evidence adduced from persons with personal knowledge of the facts." *Katz v. Goodyear Tire & Rubber Co., supra,* 737 F.2d at 244 (quoting *Burtnieks v. New York,* 716 F.2d 982, 985 (2d Cir.1983)). The opposing party "must set forth specific facts showing that there is a genuine issue for trial." Fed.R.Civ.P. 56(e); *United States v. One Tintoretto Painting, supra,* 691 F.2d at 606. Conclusory allegations or denials will not defeat a motion for summary judgment. *S.E.C. v. Research Automation Corp.,* 585 F.2d 31, 33 (2d Cir.1978). "To defeat a summary judgment motion the opposing party must set forth 'support-

ing arguments or facts in opposition to the motion.' *S.E.C. v. Research Corp., supra,* 585 F.2d at 31. If the opponent fails to substantiate the existence of a genuine dispute, a proper concern for judicial efficiency and the mandate of Rule 56(c) require summary disposition of the issue. *Id."* *Schering v. Home Ins. Co.,* 712 F.2d 4, 9 (2d Cir.1983). Summary judgment should not be denied on "the mere possibility that a factual dispute *may* exist," *Quinn v. Syracuse Model Neighborhood Corp.,* 613 F.2d 438, 445 (2d Cir.1980) (emphasis in original) or a "mere hope that evidence to support his claim would develop at trial." *Taylor v. Rederi A/S Volo,* 374 F.2d 545, 549 (3d Cir.1967). Of course, "the court must resolve all ambiguities and draw all reasonable inferences against the moving party." *Katz v. Goodyear Tire & Rubber Co., supra,* 737 F.2d at 244. Lastly, it should be noted that in resolving whether a case is ripe for summary disposition, "the court cannot *try* issues of fact but can only determine whether there *are* issues of fact to be tried." *Id.* (quoting *Empire Electronics Co. v. United States,* 311 F.2d 175, 179 (2d Cir.1962)) (emphasis in original).

### B. *Subject Matter Jurisdiction*

Before we can address the merits of plaintiff's claims to determine whether they can withstand the instant summary judgment motion, we must initially consider defendants' challenge to this court's subject matter jurisdiction of this case. Plaintiff seeks to invoke this court's jurisdiction under FTCA, 28 U.S.C. §§ 1346(b), 2671 *et seq.;* the Clean Water Act, 33 U.S.C. § 1365; CERCLA, 42 U.S.C. § 9601 *et seq.* and 28 U.S.C. § 1331(a). We first address the assertion of jurisdiction under the Federal Tort Claims Act.

### 1. *Federal Tort Claims Act*

"The basic rule of federal sovereign immunity is that the United States cannot be sued at all without the consent of Congress." *Block v. North Dakota,* 461 U.S. 273, 287, 103 S.Ct. 1811, 1819–20, 75 L.Ed.2d 840 (1983). The FTCA is a congressional waiver of sovereign immunity for "civil actions on claims against the United States, for money damages, ... for injury or loss of property ... caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).

Plaintiff seeks under the FTCA what is described as "monetary" relief from defendants. Since monetary damages is the only form of relief provided for under the FTCA, *Birnbaum v. United States,* 588 F.2d 319, 335 (2d Cir.1978), plaintiff admits that its request for injunctive relief, which also appears in the complaint, must be premised, if at all, on another jurisdictional basis. (*See* Plaintiff's Memorandum of Law at p. 5 n. 2).

■ Defendants argue that plaintiff's request for monetary damages is really a claim in nature of equitable restitution to compensate New York for the alleged actual (although unspecified) costs incurred in cleaning up the polluted areas. Defendants' argument is based on the notion that plaintiff is not seeking the value of natural resources that have been damaged, but rather the cost of removing the pollutants. Plaintiff retorts, however, that the cost of removing the contaminants is simply the suggested measure of damages to its property. The mere fact that this cost is used in calculating requested damages, they conclude, should not transform a claim for monetary damages into one for equitable relief.

We agree with plaintiff. The Supreme Court in *Rayonier Inc. v. United States,* 352 U.S. 315, 77 S.Ct. 374, 1 L.Ed.2d 354 (1957), held that negligence by the Forest Service permitting a fire to destroy timber, buildings, and other property of the plaintiff's was actionable under the FTCA. In *Rayonier,* as in the instant case, plaintiff sought recovery for damage to its property. Decisions which have disallowed recovery under the FTCA when plaintiffs seek

merely to recover firefighting *expenses* and not *property damage* in connection with the government's alleged negligence in extinguishing fires, *see, e.g., State of Idaho v. United States Department of Army*, 666 F.2d 444 (9th Cir.), *cert. denied sub nom.* 459 U.S. 823, 103 S.Ct. 53, 74 L.Ed.2d 58 (1982); *California v. United States*, 307 F.2d 941 (9th Cir.1962), are therefore inapposite.[1]

The above conclusion, however, does not end our inquiry as to our jurisdiction over this suit pursuant to the FTCA since the defendants argue that the applicable statute of limitations has expired. 28 U.S.C. § 2675(a) requires plaintiff to present its federal tort claim to the appropriate federal agency prior to filing suit in this court under the FTCA. 28 U.S.C. § 2401 provides the applicable statute of limitations as follows:

> A tort claim against the United States shall be forever barred unless it is presented in writing to the appropriate Federal agency within two years after such claim accrues or unless action is begun within six months after the date of mailing, by certified or registered mail, of notice of final denial of claim by the agency to which it was presented.

Although defendants do not concede that plaintiff made its administrative claim within the two year limitation, they provide little argument to dispute that point. Defendants do, however, contest whether plaintiff filed its suit in this court within the six month limitation following the administrative denial of its claim on July 24, 1981. Plaintiff, in fact, filed its complaint on July 29, 1982, more than one year later than the issuance of the administrative final denial letter.

Since it is well established that the six month period to file suit after a denial of an administrative claim is jurisdictional, *see, e.g., Childers v. United States*, 442 F.2d 1299, 1301 (5th Cir.), *cert. denied*, 404 U.S. 857, 92 S.Ct. 104, 30 L.Ed.2d 99 (1971); *Claremont Aircraft, Inc. v. United States*, 420 F.2d 896, 897 (9th Cir.1970); *Solomon v. United States*, 566 F.Supp. 1033, 1035 (E.D.N.Y.1982); *Heimila v. United States*, 548 F.Supp. 350, 351 (E.D. N.Y.1982), plaintiff's failure to comply with this requirement precludes this court from invoking subject matter jurisdiction of this case through the FTCA.[2]

## 2. *Rivers & Harbors Act of 1899*

Plaintiff's first cause of action is premised on § 13 of the Rivers & Harbors Act of 1899 ("RHA"), 33 U.S.C. § 407 as well as § 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a). (Amended Comp. ¶ 55–56). To the extent, plaintiff's action is grounded upon the RHA, this court has no jurisdiction over it.

It is clear that the RHA makes no explicit provision for any party other than the United States Government to enforce § 13 of the Act. To the degree plaintiff seeks to

---

**1.** Moreover, the slip opinions attached to Defendants' Reply Memorandum of Law holding—for purposes of a right to a jury trial—that CERCLA suits are in the nature of equitable restitution and therefore do not warrant a jury trial, *e.g., United States v. Reilly Tar & Chemical Corp.*, 20 Env't Rep Cas (BNA) (D.Minn.1984) are of little relevance on the issue of whether plaintiff may invoke the court's jurisdiction under the FTCA.

**2.** Defendants also argue that plaintiffs' public nuisance claim cannot be maintained under the FTCA because it is based on a strict liability standard of care under New York law and the FTCA abrogates sovereign immunity of the defendants only for their negligent or wrongful acts. *See Laird v. Nelms*, 406 U.S. 797, 798–99, 92 S.Ct. 1899, 1900–01, 32 L.Ed.2d 499 (1972).

Defendants, however, misconstrue New York law on public nuisance. As the New York Court of Appeals ruled:

> A nuisance, either public or private, based on negligence and whether characterized as either negligence or nuisance, is but a single wrong and "whenever a nuisance has its origin in negligenct," negligence must be proven. *Copart Industries, Inc. v. Consolidated Edison Co. of New York*, 41 N.Y.2d 564, 565, 394 N.Y. S.2d 169, 173, 362 N.E.2d 968 (1977). Since plaintiffs allege a negligent creation and negligent maintenance of a public nuisance, defendants' negligence must be proven and the claims could be actionable under the FTCA had plaintiff filed this suit within the applicable six month period.

bring this action "on behalf of all residents and citizens of the State of New York" (Id. ¶ 5) as a *qui tam* action, the Second Circuit has held that there is no authority to maintain such action under § 13 of the RHA. *E.g., Connecticut Action Now, Inc. v. Roberts Plating Co.,* 457 F.2d 81 (2d Cir.1972).

Similarly, we find no authority for plaintiff to bring this action under § 13 of the RHA as an implied private right of action. *Town of North Hempstead v. Village of North Hills,* 482 F.Supp. 900 (E.D.N.Y. 1979); *Parsell v. Shell Oil Co.,* 421 F.Supp. 1275 (D.Conn.1976) (Newman, J.), *aff'd without published opinion sub nom. East End Yacht Club Inc. v. Shell Oil Co.,* 573 F.2d 1289 (2d Cir.1977); *see California v. Sierra Club,* 451 U.S. 287, 292–98, 101 S.Ct. 1775, 1778–81, 68 L.Ed.2d 101 (1981) (where Court held that there is no implied private right of action under § 10 of the RHA).

### 3. *Clean Water Act*

Defendants also challenge the court's jurisdiction over plaintiff's first cause of action insofar as it is premised on § 301 of the Clean Water Act ("CWA"), 33 U.S.C. § 1311. "The [C.W.A.] makes it unlawful for any person to discharge pollutants into navigable waters except in compliance with the limits and conditions of a discharge permit." *Friends of the Earth v. Consolidated Rail Corp.,* 768 F.2d 57, 59 (2d Cir. July 19, 1985); *see Chemical Manufacturers Assoc. v. Natural Resources Defenses Council, Inc.,* ── U.S. ──, ──, 105 S.Ct. 1102, 1104, 84 L.Ed.2d 90 (1985).

Section 313 of the CWA, 33 U.S.C. § 1323, waives the sovereign immunity of federal facilities engaging in acts of water pollution and provides in pertinent part as follows:

(a) Each department, agency, or instrumentality of the executive, legislative, and judicial branches of the Federal Government (1) having jurisdiction over any property or facility, or (2) engaged in any activity resulting, or which may result, in the discharge or runoff of pollutants, and each officer, agent, or employ-

ee thereof in the performance of his official duties, shall be subject to, and comply with, all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution in the same manner, and to the same extent as any nongovernmental entity including the payment of reasonable service charges. The preceding sentence shall apply (A) to any requirement whether substantive or procedural (including any recordkeeping or reporting requirement, any requirement respecting permits and any other requirement, whatsoever), (B) to the exercise of any Federal, State, or local administrative authority, and (C) to any process and sanction, whether enforced in Federal, State, or local courts or in any other manner. This subsection shall apply notwithstanding any immunity of such agencies, officers, agents, or employees under any law or rule of law.... No officer, agent, or employee of the United States shall be personally liable for any civil penalty arising from the performance of his official duties for which he is not otherwise liable, and the United States ahll be liable only for those civil penalties arising under Federal law or imposed by a State or local court to enforce an order or the process of such court.

Section 505, 33 U.S.C. § 1365, which allows "citizens" a private right of action, provides in pertinent part:

[Any] citizen may commence a civil action on his own behalf—(1) against any person (including (i) the United States, and (ii) any other governmental instrumentality or agency to the extent permitted by the eleventh amendment to the Constitution) who is alleged to be in violation of (A) an effluent standard or limitation under this Act or (B) an order issued by the Administrator or a State with respect to such a standard or limitation, ... The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an ef-

fluent standard or limitation, or such an order, or to order the Administrator to perform such act or duty, as the case may be, and to apply any appropriate civil penalties under section 309(d) of this Act [33 USCS § 1319].

Defendants make several arguments that plaintiff's CWA cause of action should be dismissed. First, defendants argue, based upon legislative history, that § 301 of the CWA, 33 U.S.C. § 1311, does not apply to pollutant discharges in groundwater. Rather, they suggest that the section only applies to pollution in navigable waters, which they claim plaintiff has not placed in issue. We decline to reach defendants' argument as to the scope of § 301 as applied to groundwaters, since it is clear that plaintiff has alleged that the pollutants threaten to contaminate Quantuck Creek, Aspatuck Creek and Quantuck Bay, all of which are undisputably navigable waters. (Amended Comp. ¶¶ 1 & 52). *See United States v. GAF Corp.,* 389 F.Supp. 1379, 1383 (S.D. Texas 1975).

Second, defendants argue that § 313(a) of the CWA, 33 U.S.C. § 1323, only waives their sovereign immunity from liability under state laws which contain objective and administrative pre-established water pollution control standards. They claim that since plaintiff seeks to enforce state laws which require the *ad hoc* establishment of standards of conduct by the judiciary, their CWA cause of actions should be dismissed.

To examine this argument, we must analyze both § 313 and § 505 of the CWA, 33 U.S.C. §§ 1323, 1365, separately as well as their interrelationship.

Section 313 subjects federal facilities to "all Federal, State, interstate and local *requirements* ... for the control and abatement of water pollution." 33 U.S.C. § 1323(a) (emphasis added). Plaintiff claims that the various state laws cited in its complaint are "requirements" within the meaning of § 313.

**3.** "Under the NPDES, it is unlawful for any person to discharge a pollutant without obtaining a permit and complying with its terms."

In *Environmental Protection Agency v. California,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976) (*"EPA v. California"*), the Supreme Court seems to equate "requirements" in § 313 with effluent limitations and standards. *See id.* at 215 & n. 28, 96 S.Ct. at 2029–30 & n. 28. The Second Circuit has described effluent standards and limitations as:

administratively established regulations of particular types of dischargers on the amounts of pollutants that may be discharged. *See* 33 U.S.C. § 1362(11) (defining an "effluent limitation" as "any restriction established by a State or the Administrator on quantities, rates, and concentrations of chemical, physical, biological, and other constituents which are discharged from point sources...."); Zener, *The Federal Law of Water Pollution Control,* in Federal Environmental Law 682, 684 (Envtl.L.Inst.1974). The Environmental Protection Agency ("EPA") is required to establish effluent standards and limitations that all point source dischargers are required to meet. *E.g.,* 33 U.S.C. §§ 1311, 1312, 1316, 1317.

*United States v. Hooker Chemicals & Plastics,* 749 F.2d 968, 979 (2d Cir.1984).

The Supreme Court ruled in *EPA v. California, supra,* 426 U.S. at 228, 96 S.Ct. at 2035, that § 313 did not obligate federal facilities to comply with federally approved State permit requirements. Since the ability of the states to enforce their effluent limitations and standards through the National Pollutant Discharge Elimination System "NPDES" [3] was significantly undercut by the Supreme Court's ruling, Congress amended § 313 in 1977 to explicitly include "procedural" requirements, such as the permit system at issue in *EPA v. California. See Romero-Barcelo v. Brown,* 643 F.2d 835, 854 n. 36 (1st Cir.1981), *rev'd on other grounds sub nom. Weinberger v. Romero-Barcelo,* 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982); S.Rep. No. 370, 95th Cong., 1st Sess. 67, *reprinted in* 1977

*EPA v. California, supra,* 426 U.S. at 205, 96 S.Ct. at 2025.

U.S.Code Cong. & Ad.News 4326, 4392. This amendment, however, did not "expand the category of applicable *substantive* requirements" with which federal facilities must comply under § 313. *Romero-Barcelo v. Brown, supra,* 643 F.2d at 854 n. 35 (emphasis added). Therefore, to the degree the Supreme Court's ruling in *EPA v. California,* construed the substantive "requirements" of § 313 to mean effluent limitations, such ruling was unaffected by the 1977 amendments enacted by Congress.

Despite the foregoing case law and legislative history, plaintiff argues "requirements" under § 313 not only include effluent limitations but water quality standards as well. Based on this argument, plaintiff tries to show that although the defendants have not violated any effluent limitations, their alleged violation of water quality standards is actionable under the CWA.

In *Bethlehem Steel v. Environmental Protection Agency,* 538 F.2d 513, 515 (2d Cir.1976), the Second Circuit discussed at length the distinctions between effluent limitations and water quality standards as employed in the CWA:

Before the 1972 Amendments [to the CWA], water quality standards, as the Eighth Circuit has noted, were the "keystone" of the federal pollution control program. "Under that program, if wastes discharged into receiving waters reduced the quality below permissible standards, legal action could be commenced against the discharger." *CPC International Inc. v. Train,* 515 F.2d 1032, 1034–35 (8th Cir.1975). See former 33 U.S.C. § 1160(c)(5), repealed by the 1972 Act. This system was subject to criticism for several reasons. Many critics argued that the water quality standards simply were not set high enough. More important for our purposes, it was argued that enforcement was inadequate, both because the procedure was peculiarly cumbersome, and because the burden of proving that a particular polluter had caused the water quality to dip below the standards was all but impossible to satisfy.

It was this dissatisfaction with water quality standards as a method of pollution control that led to the proposal that they be replaced or supplemented with "effluent limitations":

The concept of effluent limitation has been offered as a logical alternative to the water quality standards. Instead of *indirectly* measuring discharges by their effect on water quality, monitoring equipment would *directly* measure discharges at their source. Boston College Note, supra note 5, at 752. See also statement of Hon. William D. Ruckelshaus, then Administrator of the Environmental Protection Agency, in Hearings on H.R. 1186, House Committee on Public Works (Dec. 7, 1972), reported in 2 Legislative History, supra note 2, at 1182–83. The 1972 Amendments to the [CWA] adopted this proposal, and changed the emphasis in the statutory scheme of water pollution control from that of regulating the quality standard of the body of water involved to regulating not only the quality standard of the body of water but also the quality of the effluent discharged into the body of water....

Thus, although water quality standards and effluent limitations are related, ... the two are entirely different concepts and the difference is at the heart of the 1972 Amendments.

*Id.* at 515 (citations omitted) (footnotes omitted) (emphasis in original).

█ Plaintiff argues that because water quality standards were directly enforceable against dischargers under the Act prior to the 1972 amendments, they are currently directly enforceable against the defendants. Therefore, plaintiff concludes, there was no need for the substantive requirements of § 313 to be broadened by the 1977 amendment to include water quality standards, since such standards were already encompassed within the section. What plaintiff fails to realize, however, is that prior to the 1972 Amendments, the CWA

did not provide for any waiver of sovereign immunity by federal facilities. *See* 84 Stat. 107, 33 U.S.C. § 1171(a) (1970). Moreover, as will be discussed subsequently in our analysis, prior to the 1972 amendments, there existed no private right of action for citizens to bring suit. It was only when Congress established the NPDES permit system, regulating the discharge of pollutants by specific individuals or entities, as well as changed the emphasis in enforcement under the CWA from water quality standards to effluent limitations, that Congress provided for the right of citizens to bring suit against the federal government under § 505, 33 U.S.C. § 1365. Therefore, we conclude that it is unlikely that Congress intended to waive sovereign immunity and provide for citizen suits under a method of enforcement—water quality standards—which it found to be so inadequate when the CWA was amended in 1972. *See Bethlehem Steel v. Environmental Protection Agency, supra,* 538 F.2d at 515. Rather, sovereign immunity was waived only with respect to violations of effluent limitations. This conclusion is strengthened when one considers § 505, 33 U.S.C. § 1365, in depth.

In *Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976), the Supreme Court examined the interrelationship of the parallel provisions of the Clean Air Act regarding the waiver of sovereign immunity as to federal facilities and the citizens' statutory right of action. The Court concluded in *Hancock* that "it seems most unlikely that in providing that a State might bring suit in district court to enforce the duties of federal installations under § 118 [42 U.S.C. § 1857], the Congress would not make all of those duties enforceable in district court." *Id.* at 197, 96 S.Ct. at 2021. Thus, the Court concluded that the citizens' suit provision and the waiver of sovereign immunity under the Clean Air Act are coextensive and are defined with reference to each other. *Id.; see also EPA v. California, supra,* 426 U.S. at 222–23, 96 S.Ct. at 2033.

Similarly, we conclude that § 313, 33 U.S.C. § 1323, and § 505, 33 U.S.C. § 1365 should also be construed as coextensive. Thus, the requirements for which § 313 waives federal sovereign immunity should be equal to the right of citizens to sue the United States under § 505 for violations of "effluent standards or limitations."

As previously mentioned, § 505 provides for suits "against any person (including . . . the United States . . .) who is alleged to be in violation of . . . an effluent standard or limitation." 33 U.S.C. § 1365. Effluent standards or limitations are further defined in that section as follows:

For purposes of this section, the term "effluent standard or limitation under this act" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 301 of this Act [33 U.S.C. § 1311]; (2) an effluent limitation or other limitation under section 301 or 302 of this Act [33 U.S.C. § 1311 or 1312]; (3) standard of performance under section 306 of this Act [33 U.S.C. § 1316]; (4) prohibition, effluent standard or pretreatment standards under section 307 of this Act [33 U.S.C. § 1317]; (5) certification under section 401 of this Act [33 U.S.C. § 1341]; or (6) a permit or condition thereof issued under section 402 of this Act [33 U.S.C. § 1342], which is in effect under this Act (including a requirement applicable by reason of section 313 of this Act [33 U.S.C. § 1323].

§ 505(f), 33 U.S.C. § 1365(f).

Subsections (f)(1) through (f)(4) refer to control requirements of federal law and (f)(5) pertains to requirements of state law which are specified in federally issued NPDES permits. Subsection 505(f)(6) refers to a "requirement" applicable under § 313, 33 U.S.C. § 1323, which is "in effect" as being issued under a permit or condition under the NPDES permit authority of § 402, 33 U.S.C. § 1342. Thus, on the face of the statute, the only state law "requirements" which are enforceable under § 505 are those established administratively through the issuance of NPDES permit. *See EPA v. California, supra,* 426 U.S. at 222–24, 96 S.Ct. at 2033.

This interpretation of § 505 is supported by examining its legislative history. The Senate Report accompanying the amendments to the CWA which added the private right of action of citizens in § 505 states the following:

> Section 505 would not substitute a "common law" or court-developed definition of water quality. An alleged violation of an effluent control limitation or standard, would not require reanalysis of technological in other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision. Therefore, an objective evidentiary standard will hve to be met by any citizen who brings an action under this section.
>
> . . . .
>
> ... Whether abatement is sought by an agency or by a citizen, there should be a considerable record available to the courts in any enforcement proceeding resulting from the Federal and State administrative standard-setting procedures. Consequently, the factual basis for enforcement of requirements would be available at the time enforcement is sought, and the issue before the courts would be a factual one of whether there had been compliance.

S.Rep. No. 414, 92d Cong., 2d Sess., *reprinted in* 1972 U.S.Code Cong. & Ad. News 3668, 3745, 3746. Therefore, it is clear that Congress intended that § 505 would create a private right of action only to enforce effluent limitations and standards that are administratively predetermined through NPDES permits issued under §§ 301, 302, 304, 306, and 307. As a necessary implication of this explicit legislative intent, we conclude that Congress did not wish to authorize suits under § 505 against federal facilities under state water quality standards since that would require the courts to develop their own definition of what are prohibitive levels of water pollution.

This conclusion that water quality standards are not enforceable under § 505 is also supported by the relevant case law. *See, e.g., United States v. Hooker Chemicals & Plastics, supra,* 749 F.2d at 978 ("[a]uthority granted to citizens to bring enforcement actions under [§ 505] is limited to effluent standards or limitations *established administratively* under the Act" and do not pertain to the "creation of an imminent and substantial endangerment") (quoting S.Rep. No. 414, *reprinted in* 1972 U.S.Code Cong. & Ad.News at 3747 (emphasis in original)); *Stream Pollution Control Board of Indiana v. U.S. Steel,* 512 F.2d 1036, 1041 (7th Cir.1975) (action to abate a nuisance is not actionable under § 505 since it is not an action commenced to require compliance with an effluent limitation, standard or administrative order); *Town of North Hempstead v. Village of North Hills, supra,* 482 F.Supp. at 904 (action under § 505 "may only be maintained to enforce a previously promulgated effluent standard or order of the Administrator of the EPA with respect to such a standard"); *cf. Romero-Barcelo v. Brown, supra,* 643 F.2d at 855–56 (interpreting the analogous citizens' suit provision, 42 U.S.C. § 4711, and the analogous federal sovereign immunity waiver provision, 42 U.S.C. § 4903, of the Noise Control Act, the Court concluded that "requirements" respecting noise control and abatement do not include the Commonwealth of Puerto Rico's nuisance statute since it does not provide the type of "relatively precise standards capable of uniform application to similar sources of sound").

After a thorough consideration of plaintiff's second through eighth causes of action—all of which are based on state law—in light of the foregoing analysis, we conclude that all of these theories of suit fail to provide the types of substantive "requirements" that are enforceable under § 505 and § 313. This failure is predicated on a common defect—the lack of an objective, administratively predetermined effluent standard or limitation or administrative order upon which to measure the prohibitive levels of water pollution. Extensive discussion of each of the state causes of action is unnecessary since it is clear

that utilization of any of them as a basis of suit under the CWA would result in the type of ad hoc judicial enforcement Congress clearly did not envision.

### 4. *Comprehensive Environmental Response Compensation and Liability Act (CERCLA)*

■ Plaintiff's ninth cause of action seeks relief under CERCLA, 42 U.S.C. § 9601 *et seq.* for costs and expenses in the "removal, remediation and response to the contamination" which allegedly occurred. (Amended Comp. ¶ 83).

As analyzed by the Second Circuit in *State of New York v. Shore Realty Corp.,* 759 F.2d 1032 (2d Cir.1985):

> CERCLA was designed to "bring order to the array of partly redundant, partly inadequate federal hazardous substances cleanup and compensation laws." It applies "primarily to the cleanup of leaking inactive or abandoned sites and to emergency responses to spills...." And it distinguishes between two kinds of response: remedial actions—generally long-term or permanent containment or disposal programs—and removal efforts—typically short-term cleanup arrangements.

*Id.* at 1040 (footnotes omitted) (quoting F. Anderson, D. Mandelker & A. Tarlock, Environmental Protection: Law and Policy 568 (1984)). CERCLA authorizes the federal government, through the auspices of the Environmental Protection Agency ("EPA") to respond to toxic pollution in several ways: (1) "EPA can use Superfund resources to clean up hazardous waste sites and spills," 42 U.S.C. § 9611, in accordance with the National Contingency Plan's ("NCP") standards and procedures, established by the EPA, 42 U.S.C. § 9605; (2) "EPA can sue for reimbursement of cleanup costs from any responsible parties it can locate," 42 U.S.C. § 9607; (3) EPA can "seek an injunction in federal district court to force a responsible party to clean up any site or spill that presents an imminent and substantial danger to public health or the environment," 42 U.S.C. § 9606(a). *Id.* at

1041. In addition to congressional authorization of cleanup responsibility to the EPA under CERCLA, the Act also provides that states "can sue responsible parties for remedial and removal costs if such efforts are 'not inconsistent with' the NCP." *Id.* (quoting 42 U.S.C. § 9607(a)(4)(A)). Moreover, although CERCLA does not preempt state law, 42 U.S.C. § 9614(a), it does prohibit "states from requiring contributions to any fund 'the purpose of which is to pay compensation for claims ... which may be compensated under CERCLA'". *Id.* (quoting 42 U.S.C. § 9614(c)). Finally, it should be noted that under CERCLA responsible parties are "liable for ... damages for injury to destruction of, or loss of natural resources, including or loss resulting from such a release," 42 U.S.C. § 9607(a)(4)(c), under the doctrine of strict liability. *Id.* at 1042.

In the case at bar, plaintiff, the State of New York, brings suit against the defendants for their alleged violation of 42 U.S.C. § 9607(a)(4)(A) & (B) as a result of their disposal of "hazardous substances." Defendants neither dispute that the United States Government is amenable to suit under CERCLA, 42 U.S.C. § 9607(g) nor that they are a "person" who can be held strictly liable under the statute. 42 U.S.C. § 9601(21) ("'person' means ... United States Government"). Rather, defendants premise their motion for summary judgment on the CERCLA cause of action on the theory that JP4 jet fuel which allegedly polluted the area in question is not a "hazardous substance" within the meaning of CERCLA.

42 U.S.C. § 9601(14) defines hazardous substance as follows:

> (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A) ], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 USCS § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act

[42 USCS § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a) ], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 USCS § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 USCS § 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

Plaintiff specifically alleges that the defendants disposed of JP4, carbon tetrachloride, dye penetrants, degreasers, acids, hydraulic fluid, drain oil and other hazardous chemicals. Defendants claim that JP4 "consists of one or more fractions of crude petroleum," which is "a complex mixture of organic compounds," containing "some quantities of benzene toluene [and] xylene." (Churchill Aff. ¶¶ 4, 7 & 8). Although defendants acknowledge that pursuant to 42 U.S.C. § 9601(14)(A) & (C) that benzene, toluene and xylene have been individually designated to be "hazardous substances," 40 C.F.R. § 116.4; 40 C.F.R. § 261.33, they argue that JP4 is a "petroleum" product explicitly excluded from the statutory definition of "hazardous substances."

While it is true that 42 U.S.C. § 9601(14) does exclude petroleum, "crude oil or any fraction thereof" as a hazardous substance, such exclusion is conditioned on the substance in question not being "specifically listed or designated as a hazardous substance under subparagraphs (A) through (F)." 42 U.S.C. § 9601(14). To avoid the fatal impact to their argument by the fact that components of JP4 are specifically designated as hazardous substances, defendants argue that "[i]f the mere presence of small amounts of benzene, toluene and xylene were held to remove a petroleum product from the exemption, many of the most common petroleum products, and crude petroleum itself, would fall outside the ambit of the exemption." (Defendants' Memorandum of Law p. 78).

Although defendants' argument has some surface appeal, based upon the facts as they are presently before us, we need not reach this issue of statutory construction to deny defendants' summary judgment motion. This decision is based on the following reasons. First, even if the defendants' statutory interpretation is correct, there exists a genuine factual dispute as to whether these hazardous substances —benzene, toluene and xylene—were originally constituents of other materials besides JP4. This factual dispute is based on plaintiff's claims that (supported by an affidavit from an environmental scientist) that these substances are constituents of a variety of non-petroleum products, including some of the chemical solvents defendants allegedly disposed of at the sites in question. (Shkuda Aff. ¶ 3).

Second, plaintiff alleges and the defendants have not disputed that "carbon tetrachloride, diethylether, chlorobenzene, acetone, methyethyl ketone, 1, 1, 1-trichloroethane, 1, 1, 2-trichloroethane, trichloroethylene, bromobenzene and tetrachloroethylene" are all hazardous substances within the meaning of 42 U.S.C. § 9601(14) as specified in 40 C.F.R. § 261.33, and have all been found to contaminate the groundwater in question. (*Id.* ¶ 7).

Thus, based upon the foregoing, we conclude that plaintiff has raised a genuine factual dispute as to whether or not defendants disposed of hazardous substances within the meaning of CERCLA. Defendants' motion for summary judgment with respect to the CERCLA cause of action is therefore denied.

### 5. *Pendent State Law Claims*

■ Plaintiff has set forth seven causes of action based exclusively upon state law. Assuming *arguendo* that these causes of action and the federally based CERCLA action "derive from a common nucleus of operative fact," *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 725, 86 S.Ct. 1130, 1138, 16 L.Ed.2d 218 (1966), and that the state law claims are legally cognizable, we are still without jurisdiction to entertain them. Our lack of jurisdiction over these claims is premised on plaintiff's failure to show any waiver of sovereign immunity with respect to these state law actions. *See United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 953, 47 L.Ed.2d 114 (1976) ("It has long been established, of course, that the United States, as sovereign, 'is immune from suit save as it consents to be sued ... and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit.' ") (quoting *United States v. Sherwood*, 312 U.S. 584, 586, 61 S.Ct. 767, 769–70, 85 L.Ed. 1058 (1941)). Plaintiff's attempt at relying upon the Federal Tort Claims Act as a basis for jurisdiction and to provide a waiver of sovereign immunity over these claims was rejected because of plaintiff's failure to comply with the relevant six month statute of limitations. Similarly, we rejected any reliance upon the CWA as a basis for jurisdiction and waiver of sovereign immunity over these claims since these causes of action do not fall within our construction of the term "requirement." Lastly, we conclude that CERCLA's waiver of sovereign immunity cannot apply to these state law claims since it is clear from the relevant statute that the waiver is limited only to compliance with CERCLA. 42 U.S.C. § 9607(g) ("Federal Government shall be subject to and comply with *this Act* in the same manner and to the same extent ... as any nongovernmental entity....") (emphasis added). Therefore, finding no basis upon which we conclude that there is a waiver of sovereign immunity as to the state law claims, these claims are dismissed for lack of subject matter jurisdiction.

### IV. CONCLUSION

Defendants' motion for summary judgment is granted in part insofar as the first eight causes of action enumerated in the amended complaint are dismissed and is denied in part with respect to the CERCLA claim, the ninth cause of action enumerated in the amended complaint.

SO ORDERED.

