**McCLELLAN ECOLOGICAL SEEPAGE SITUATION (MESS), Mary Fisher, Charles and Sandy Yarbrough, Plaintiffs,**

v.

**Caspar Willard WEINBERGER, Secretary of the United States Department of Defense, Defendant.**

**No. CIV S–86–475–RAR.**

United States District Court,
E.D. California.

June 20, 1988.

Michael Axeline, Western Natural Resources Law Clinic, Eugene, Or., for plaintiffs.

Steve Samuels, U.S. Dept. of Justice, Washington, D.C., for defendant.

## MEMORANDUM OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT

RAMIREZ, District Judge.

### INTRODUCTION

On April 23, 1986, plaintiffs McClellan Ecological Seepage Situation, Mary Fisher, and Charles and Sandy Yarbrough (hereinafter "MESS") brought this action seeking declaratory and injunctive relief as well as civil penalties against the Secretary of the Department of Defense under the Resource Conservation and Recovery Act ("RCRA"), 42 U.S.C. §§ 6901–6987; the Clean Water Act ("CWA"), 33 U.S.C. §§ 1251–1376; California hazardous waste laws; and California water quality laws. The complaint, which originally included twenty-three counts, alleges violations of those statutes by McClellan Air Force Base ("McClellan") in Sacramento, California. On December 9, 1986, this Court granted the Government's motion to dismiss MESS' request for civil penalties. *McClellan Ecological Seepage Situation v. Weinberger*, 655 F.Supp. 601 (E.D.Cal.1986). Moreover, by stipulation and order, Counts 1, 4(A), 7, and 19(C) of the complaint have been dismissed without prejudice. (Orders dated August 4, 1987 and September 25, 1987.)

On July 2, 1987, MESS filed a motion for partial summary judgment with respect to Counts 2, 3, 4(B and C), 6, 8, 10, 12, 13, 14, 15, 16, 22, and 23 of its complaint. On October 26, 1987, the Government filed a motion for summary judgment, which relates to all counts of the complaint except those previously dismissed by stipulation and order. After full briefing of the cross-motions for summary judgment, oral argument was held on February 8, 1988. At the conclusion of the argument, the Court

ruled from the bench on the cross-motions. This memorandum opinion formalizes that bench ruling.

MESS is a group of concerned citizens who live near McClellan Air Force Base. McClellan is a major aircraft maintenance facility operated by the Department of Defense. In its complaint, MESS alleges that McClellan's practices and procedures with respect to industrial and domestic wastes have violated and threaten to violate various environmental laws. Specifically, MESS alleges that McClellan's generation, treatment, and disposal of wastes are in conflict with RCRA (Counts 2 through 5); provisions of the California Health and Safety Code (Counts 6 through 11 and 21); the Clean Water Act (Counts 12 through 15, 22, and 23); provisions of the California Water Code (Counts 16 through 19); and the California Fish and Game Code (Count 20). Counts 2 through 11 are brought under the citizen suit provision of RCRA, RCRA § 7002(a)(1)(A), 42 U.S.C. § 6972(a)(1)(A), and Counts 12 through 23 are brought under the citizen suit provision of the Clean Water Act, CWA § 505(a)(1), 33 U.S.C. § 1365(a)(1).[1]

By agreement of counsel and the Court, proceedings in this action were bifurcated. The present round of motions for summary judgment involves purely legal issues, undisputed facts, or facts the development of which have not required extensive discovery. Any issues not resolved in this round of motions will be subject to additional discovery and a second round of motions for summary judgment at a later date.

This opinion will address the remaining counts in MESS' complaint one-by-one. Each major section below (RCRA and the Clean Water Act) will be preceded by a brief overview of the relevant statutory provisions.

### CLAIMS BROUGHT UNDER RCRA

Subtitle C of RCRA creates a "cradle-to-grave" management system which is in-

---

1. On April 1, 1988, the Court granted MESS' motion for leave to file an amended complaint. The amended complaint adds a cause of action based upon the Administrative Procedure Act.

However, Counts 2 through 23 of the amended complaint are identical to Counts 2 through 23 of the original complaint.

tended to ensure that hazardous wastes are safely treated, stored, and disposed of after November 19, 1980. 42 U.S.C. §§ 6921–6934. Section 3005 of RCRA, 42 U.S.C. § 6925, requires facilities that treat, store, or dispose of hazardous waste after November 19, 1980 to obtain a permit from EPA or from a state authorized by EPA to administer its own hazardous waste program. There are two parts to a permit application—Part A and Part B. Part A requires general background information regarding the management of hazardous wastes at a facility, while Part B requires a much more extensive report. *See* 40 C.F.R. § 270.14.

Congress recognized that if every hazardous waste management facility in existence on November 19, 1980 was immediately subject to the permit requirements of RCRA, a bureaucratic nightmare would exist for the Environmental Protection Agency ("EPA"), the agency charged with administering RCRA in coordination with the states. Therefore, in order to provide for an ample amount of time to set up the administrative machinery necessary to accommodate all the requirements of RCRA, Congress established a program of interim status for facilities already in operation, such as McClellan. Under this program, certain existing hazardous waste management facilities are treated as having been issued a RCRA permit until final administrative disposition of their permit applications can be made. RCRA § 3005(e), 42 U.S.C. § 6925(e).

In order to obtain this "interim status," a hazardous waste management facility must fulfill three conditions. *See* RCRA § 3005(e)(1). First, the facility must have been in existence on November 19, 1980 or on the effective date of the statutory or regulatory changes which render the facility subject to the permit requirement. Second, where applicable, the owner or operator must have submitted preliminary notification to EPA stating the location and general description of its hazardous waste activity and listing the hazardous wastes involved in its operation. Finally, the owner or operator must have applied for a permit under RCRA § 3005. EPA has interpreted

this third condition as requiring submission only of Part A of the permit application; Part B is submitted when EPA initiates the final permitting process for an individual facility. 40 C.F.R. § 270.1(b). Facilities with interim status must comply with self-implementing technical standards that are analogous to but less stringent than the standards for permitted facilities. *See* 40 C.F.R. Part 270.1(b) and Part 265.

Congress was also concerned that the Federal government might not be able to administer the RCRA program effectively in all states. Accordingly, Congress enacted provisions which allow the various states to receive full or partial authorization to administer their own hazardous waste programs "in lieu of" the Federal program. Specifically, section 3006 of RCRA, 42 U.S.C. § 6926, provides that any state wishing to administer and enforce a hazardous waste program under RCRA may apply to the EPA Administrator for authorization. If the Administrator determines that the state program satisfies specified standards, the state is authorized to administer its program "in lieu of" the federal program. California received partial interim authorization in 1981 and 1983, but that authorization expired on January 31, 1986. 51 Fed.Reg. 4128 (Jan. 31, 1986).

Congress also provided for a limited waiver of sovereign immunity in RCRA. Specifically, section 6001 of RCRA, 42 U.S.C. § 6961, provides that facilities operated by the federal government are subject to all federal, state, interstate, and local "requirements" respecting the control and abatement of solid waste or hazardous waste disposal. Moreover, section 7002(a) of RCRA, 42 U.S.C. § 6972(a), authorizes any person to commence a civil action against any other person, including the United States, who is alleged to be in violation of an obligation "which has become effective pursuant to" RCRA. However, such a citizen suit may be maintained only if the plaintiff has provided sixty days notice of its claims to the alleged violator, the state, and EPA. RCRA § 7002(b)(1).

Waivers of sovereign immunity, of course, are not to be liberally interpreted.

As this Court previously stated in dismissing MESS' claim for civil penalties, the United States cannot be sued unless it consents to be sued. *Block v. North Dakota,* 461 U.S. 273, 287, 103 S.Ct. 1811, 1819, 75 L.Ed.2d 840 (1983). There cannot be a waiver of sovereign immunity unless the waiver is clear, concise, and unequivocal. *Army & Air Force Exchange Service v. Sheehan,* 456 U.S. 728, 734, 102 S.Ct. 2118, 2122, 72 L.Ed.2d 520 (1982). When there is any doubt, waiver will not be found. Waiver cannot be implied. It cannot be assumed. It cannot be based on speculation, surmise, or conjecture. *United States v. King,* 395 U.S. 1, 4, 89 S.Ct. 1501, 1502, 23 L.Ed.2d 52 (1969). Ambiguous language will not equate to waiver. Any limitation on the United States' consent to be sued must be strictly construed in favor of the sovereign and may not be modified by implication. *Ruckelshaus v. Sierra Club,* 463 U.S. 680, 683–85, 103 S.Ct. 3274, 3276–77, 77 L.Ed.2d 938 (1983).

Count 2—RCRA § 3005(a)

In Count 2 of the complaint, MESS alleges that McClellan has violated section 3005(a) of RCRA. That section prohibits the treatment, storage, or disposal of hazardous wastes after the effective date of regulations promulgated by EPA, except in accordance with a permit. MESS asserts that McClellan "has been discharging, storing, and treating hazardous wastes without a permit to do so since November 19, 1980, when the regulations identifying the characteristics of hazardous wastes (40 C.F.R. § 261.31) became effective." Complaint ¶ 45. Specifically, MESS contends that McClellan's Part A application did not mention "storage of hazardous wastes in the base cooling system and in unlined underground burial pits" (MESS Memorandum at 21) and that McClellan therefore lacks interim status with respect to those sites.

*Cooling Towers*

■ With respect to the cooling towers, McClellan states that in the past it has used treated wastewater from the base's reclamation system in approximately one hundred cooling towers that are used to cool buildings on the base. The treated wastewater was circulated through the cooling towers and then returned to the treatment facility. However, that practice was discontinued in October 1985 with respect to most of the cooling towers and in March 1986—one month prior to the filing of the present suit—with respect to the remaining cooling towers. *See* Affidavit of Paul G. Brunner, attached to McClellan's motion for summary judgment, ¶ 8. MESS does not dispute McClellan's assertion that it has not used any treated wastewater in the cooling towers since March 1986.

■ McClellan's termination of the use of treated wastewater in the cooling towers makes Count 2 moot insofar as it relates to the towers. The citizen suit provisions of RCRA and the Clean Water Act are forward-looking; they are intended to remedy present and future harmful impacts, not conduct that has occurred entirely in the past and cannot reasonably be expected to result in future harm.

The Supreme Court recently addressed the purposes of the citizen suit provision of the Clean Water Act in *Gwaltney v. Chesapeake Bay Foundation,* 484 U.S. 49, 108 S.Ct. 376, 98 L.Ed.2d 306 (1987). For present purposes, that provision is almost identical to the RCRA citizen suit provision. Based upon the actual language of that provision as well as the definition of "citizen," the Court concluded that "the harm sought to be addressed by the citizen suit lies in the present or the future, not in the past." 108 S.Ct. at 382. In order for a district court to have jurisdiction over a citizen suit claim, the Court concluded, the underlying complaint must contain a good-faith allegation that the conduct complained of is continuing in nature.

Here, the conduct complained of—use of treated wastewater in the cooling towers—was discontinued one month prior to the filing of the complaint. Therefore, the question might arise whether MESS' allegation that the conduct was continuing as of April 1986 was made in good faith. I need not reach that issue, however, because even where there is a good-faith allegation of a continuing violation, the claim might be moot where that allegation turns

out to be in error. As the Supreme Court stated in *Gwaltney;*

> Longstanding principles of mootness ... prevent the maintenance of suit when " 'there is no reasonable expectation that the wrong will be repeated.' " *United States v. W.T. Grant Co.*, 345 U.S. 629, 633, 73 S.Ct. 894, 897, 97 L.Ed. 1303 (1953) (quoting *United States v. Aluminum Co. of America*, 148 F.2d 416, 448 (CA2 1945). In seeking to have a case dismissed as moot, however, the defendant's burden "is a heavy one." 345 U.S., at 633, 73 S.Ct., at 897. The defendant must demonstrate that it is "absolutely clear that the allegedly wrongful behavior could not reasonably be expected to recur." *United States v. Phosphate Export Assn., Inc.*, 393 U.S. 199, 203, 89 S.Ct. 361, 364, 21 L.Ed.2d 344 (1968).

108 S.Ct. at 386 (emphasis added by *Gwaltney* Court).

The Court concludes that the Government here has met the heavy burden of demonstrating mootness. McClellan has provided evidence by means of the Brunner affidavit—and MESS has not disputed that evidence—that it has not used treated wastewater in the cooling towers for nearly two years. There is simply no reason to believe that McClellan has any intention of using treated wastewater in the cooling towers any time in the future. Accordingly, the Court grants the Government's motion for summary judgment on that part of Count 2 that seeks injunctive relief with respect to the use of treated wastewater in the cooling towers.

MESS has also requested declaratory relief on this and all other issues. The Court is not prepared to rule at this time on whether declaratory relief is appropriate with respect to claims that are dismissed on mootness grounds. Instead, the Court will ask that the parties brief that issue in the context of the next round of dispositive motions in this proceeding.

*Waste Pits*

█ MESS also alleges that McClellan is storing hazardous wastes in unlined waste pits in violation of RCRA. The crux of MESS' contention is that McClellan's Part A application did not mention certain unlined burial pits on the base and therefore McClellan does not have interim status with respect to those pits. The Government's position is that all the waste pits not identified in its Part A have been inactive since at least November 19, 1980 and therefore a RCRA permit is not required with respect to those disposal sites.

RCRA is not a model of clarity in this respect. On the one hand, certain provisions suggest that the permit requirements are intended to apply only to the treatment, storage, or disposal of hazardous wastes occurring after November 19, 1980, the effective date of the RCRA implementing regulations. Section 3005(a) of RCRA specifically requires permits only for the management of hazardous wastes "after such date" that EPA's permit regulations take effect. In addition, EPA's regulations provide that permits are required only during the "active life" of hazardous waste management units. 40 C.F.R. § 270.1(c). *See also* 45 Fed.Reg. 33,068 (May 19, 1980) ("The Agency's intent is not to regulate under Subtitle C portions of facilities closed before the effective date of the regulations"); 45 Fed.Reg. 12,747 (Feb. 26, 1980) ("RCRA Subtitle C Regulations do not cover ... abandoned sites").

On the other hand, certain provisions suggest that permit requirements may apply to the maintenance of an inactive disposal site within an active facility. For example, section 3004(u) of RCRA, 42 U.S.C. § 6924(u), provides that prior to issuing a permit to a facility, EPA may require corrective action with respect to certain releases of hazardous waste from past waste disposal sites at that facility. Similarly, section 3008(h), 42 U.S.C. § 6928(h), provides EPA with enforcement authority to require corrective action with respect to releases of hazardous waste into the environment from facilities with interim status. Moreover, section 7003, 42 U.S.C. § 6973, authorizes EPA to bring suit against anyone who has contributed to the past handling, storage, treatment, transportation, or disposal of waste that may present an

imminent and substantial endangerment to health or the environment.

Having said all this, the narrow question presented in Count 2 is whether McClellan was required to apply for a RCRA permit with respect to the waste pits that were not specifically identified in its Part A application. The answer to this question might very well turn on whether the waste pits were "active" after November 19, 1980. MESS contends that the pits were and continue to be active after that date because McClellan is actively "storing" hazardous wastes in the pits. The Government, on the other hand, contends that the wastes placed in the pits were intended for permanent disposal and that no new wastes have been added to those pits since November 19, 1980. The Government states that the only activity that has occurred at any of these sites relates to its Installation Restoration Program ("IRP"), which is designed to mitigate any actual or threatened damage to the environment caused by its past disposal activities, and that activities undertaken pursuant to the IRP are exempt from RCRA permit requirements. *See* section 121(a) of the Superfund Amendments and Reauthorization Act of 1986, adding new section 121(e) to the Comprehensive Environmental Response, Compensation, and Liability Act.

In view of the parties' disagreement as to whether McClellan actively managed hazardous wastes in the waste pits subsequent to November 19, 1980, the Court determines that there is a triable issue of fact that can benefit from further discovery. Accordingly, the cross-motions for summary judgment on Count 2 are denied insofar as that count relates to McClellan's waste pits.

Count 3—RCRA § 3010(a)

Count 3 alleges that McClellan failed to give EPA notice of its hazardous waste activities under section 3010(a) of RCRA, 42 U.S.C. § 6930(a). That section provides that within ninety days of the promulgation of relevant regulations by EPA, persons engaged in hazardous waste activity shall file "a notification stating the location and general description of such activity and the identified or listed hazardous wastes handled by such person." MESS contends that McClellan violated this requirement because the notification filed by McClellan on August 19, 1980 omitted any mention of the hazardous wastes that are "stored" in the waste pits. The Government responds that the notification requirement was never intended as a means of locating inactive disposal sites and that it fully complied with section 3010(a) in any event.

Resolution of Count 3 might depend upon whether McClellan was actively handling hazardous wastes in the waste pits at the time that it filed its notification under section 3010(a). Because the Court has already concluded that that is a triable issue of fact, Count 3 should also remain open for now. Accordingly, the cross-motions for summary judgment on Count 3 are denied.

Count 4—RCRA § 3005(e)

Count 4 alleges that McClellan is violating its interim status by using treated wastewater from the industrial waste treatment facility in the cooling system and by misstating in its Part A application the hazardous wastes to be treated, stored, or disposed of on the base.

Count 4 is principally a restatement of Count 2 and the same ruling should apply. Accordingly, that part of Count 4 that relates to the cooling towers is dismissed on mootness grounds with respect to injunctive relief but not declaratory relief, and the cross-motions for summary judgment are denied insofar as Count 4 relates to McClellan's waste pits.

Count 5—40 C.F.R. Part 265

Count 5 alleges several violations of the provisions of 40 C.F.R. Part 265. Part 265 sets forth minimum standards for the management of hazardous waste during a facility's interim status. *See* 40 C.F.R. § 265.1.

MESS first asserts that McClellan has violated 40 C.F.R. § 265.15. Complaint ¶ 48. Section 265.15(a) requires owners of hazardous waste facilities to inspect their facilities for malfunctions and deteriora-

tion, operator errors, and discharges which may cause the release of hazardous waste constituents to the environment or a threat to human health. Section 265.15(c) requires owners to remedy any deterioration or malfunction in order to avoid an environmental or human health hazard.

■ MESS further alleges that McClellan is violating the interim status standards for waste piles (40 C.F.R. § 265.250) and land treatment (40 C.F.R. § 265.270). Specifically, MESS asserts that McClellan is violating the provisions of 40 C.F.R. §§ 265.250 and 265.270 "by storing hazardous waste drums on permeable bases, storing other hazardous wastes in unlined pits, and failing to protect these sites by water run-on control systems or water run-off management systems." Complaint ¶ 49.

Part 265 applies only to hazardous waste units that are subject to RCRA's interim status provisions. Thus, if a RCRA permit is not required for a particular unit, then that unit is not covered by Part 265. The Court will therefore defer ruling on Count 5 insofar as it relates to McClellan's waste pits for the same reason that a ruling on Count 2 has been deferred.

However, insofar as Count 5 relates to hazardous waste drums, summary judgment in favor of the Government is granted. The particular regulations cited by MESS—40 C.F.R. §§ 265.250 and 265.270—do not apply to waste drums. Rather, waste drums are covered by 40 C.F.R. § 265.170, which covers the use and management of containers. Section 265.-170 does not in any way require a water run-on/run-off management system. In any event, it is undisputed that McClellan does have a management system in place to prevent water run-on and run-off in its staging areas. This system consists of secondary containment in the form of concrete berms, which prevent water from entering and hazardous waste spills from exiting the storage sites. McClellan also uses trailers with secondary containment features at its hazardous waste temporary staging areas. Brunner Affidavit ¶ 5.

Accordingly, the Government's motion for summary judgment on Count 5 is granted with respect to waste drums and denied with respect to waste pits.

Counts 6, 8, 9, 10, and 11—California Solid Waste Law

■ MESS alleges in Counts 6, 8, 9, and 10 of the complaint that McClellan has violated various provisions of California solid waste law. Specifically, Count 6 alleges that McClellan has violated section 25201 of the California Health and Safety Code, which requires state permits for the treatment, storage, or disposal of hazardous wastes. Count 8 alleges a violation of section 25154 of the Health and Safety Code, which prohibits the handling, storage, use, processing, or disposal of hazardous wastes except as provided for under Chapter 6.5 of the Code or regulations adopted by the state. Count 9 alleges a violation of section 25155 of the Health and Safety Code, which prohibits the disposal of extremely hazardous wastes without prior processing to remove harmful properties. Count 10 alleges a violation of section 25203 of the Health and Safety Code, which prohibits the disposal of hazardous waste at any unpermitted disposal site.

Count 11 alleges that McClellan is violating certain discharge specifications in Order No. 78–99, issued by the California Regional Water Quality Control Board on September 8, 1978.

The Government contends that each of these counts should be dismissed for lack of jurisdiction under the RCRA citizen suit provision. Specifically, the Government argues that section 7002 of RCRA limits citizen suits to alleged violations of "any permit, standard, regulation, condition, requirement, prohibition, or order which has become effective pursuant to [RCRA]." (Emphasis added.) According to the Government, the obligations alleged to have been violated in Counts 6, 8, 9, 10, and 11 are not effective pursuant to RCRA and therefore the Court lacks subject matter jurisdiction. The Court agrees.

A state statute could arguably have become effective pursuant to RCRA if it is part of a state hazardous waste program that has been authorized by EPA under

section 3006 of RCRA, 42 U.S.C. § 6926, to apply in lieu of the federal hazardous waste program. Under section 3006(c)(1), EPA has the authority to grant interim authorization to state programs that are "substantially equivalent" to the federal program. Under section 3006(b), EPA may grant final authorization to state hazardous waste programs that: (1) are equivalent to the federal hazardous waste program; (2) are consistent with the federal program and other state programs that have received final authorization; and (3) provide adequate enforcement. Section 3006(c)(1) provides that a state's interim authorization automatically expires on January 31, 1986 and authority to administer and enforce the entire RCRA program reverts to the federal government on that date unless the state has been granted final authorization.

California received partial interim authorization on June 4, 1981. This authorization related to EPA's regulations in 40 C.F.R. Parts 260, 261, 262, 263, and 265, covering identification and listing of hazardous wastes, standards applicable to generators, standards applicable to transporters, and standards applicable to interim status facilities. See 50 Fed.Reg. 5259 Feb. 7, 1985). On January 11, 1983, California received additional interim authorization under RCRA § 3006 limited to permitting authority for the storage and treatment of hazardous wastes in tanks and containers. This interim authorization specifically did not include permitting authority with respect to: (1) treatment of hazardous wastes in surface impoundments, waste piles, land treatment facilities, or incinerators; (2) storage of hazardous wastes in surface impoundments or waste piles; or (3) disposal facilities. 50 Fed.Reg. 5259. On January 31, 1986, even this limited authorization to administer the California hazardous waste

program in lieu of the federal program expired. See 51 Fed.Reg. 4128 (Jan. 31, 1986). No part of the California hazardous waste program is presently authorized under RCRA § 3006.

Because California's interim authorization has expired, that state's hazardous waste laws are not even arguably "effective pursuant to [RCRA]." RCRA § 7002(a)(1)(A). Indeed, California never had authorization with respect to most of the provisions involved in Counts 6, 8, 9, 10, and 11. Under these circumstances, the violations of state statutory provisions alleged by MESS cannot be reviewed in the context of a citizen suit under RCRA § 7002.[2] Accordingly, this Court lacks jurisdiction over Counts 6, 8, 9, 10, and 11 and those counts must therefore be dismissed. It also follows that MESS' motion for summary judgment with respect to Counts 6, 8, and 10 must be denied.

In view of the above determination, it is not necessary to address the Government's alternative arguments that the state law counts should be dismissed on other grounds.

## CLAIMS BROUGHT UNDER THE CLEAN WATER ACT

Section 301(a) of the Clean Water Act, 33 U.S.C. § 1311(a), prohibits the discharge of pollutants into navigable waters of the United States except pursuant to a permit issued under section 402 of the Act, 33 U.S.C. § 1342. The EPA Administrator is directed to establish effluent limitations and standards of performance for "point sources" of pollution. CWA §§ 304, 306, 307, 33 U.S.C. §§ 1314, 1316, 1317. Through the National Pollutant Discharge Elimination System ("NPDES"), established pursuant to section 402 of the CWA, these standards and limitations, together

---

**2.** MESS contends that the federal facility provision of RCRA, section 6001, became effective pursuant to RCRA and therefore the Court has jurisdiction under section 7002. Section 6001, however, is not itself a "permit, standard, regulation, condition, requirement, prohibition, or order" as those terms are used in section 7002; rather, section 6001 is a waiver of sovereign immunity with respect to certain substantive

and procedural requirements that have independent existence outside of section 6001. Indeed, Counts 6, 8, 9, 10, and 11 do not allege violations of section 6001; rather, they allege violations of state solid waste laws. It is these laws that must have become effective pursuant to RCRA for this Court to have jurisdiction under section 7002.

with any applicable limitations based on state law, are incorporated into individual NPDES permits which regulate a particular person's discharges into waters of the United States.

Under section 402(b) of the Clean Water Act, a state may administer the NPDES permit program upon approval by EPA. California obtained such permitting authority on May 14, 1973. 39 Fed.Reg. 26,061.

As with RCRA, the Clean Water Act provides for a limited waiver of sovereign immunity. Specifically, section 313(a) of the Act, 33 U.S.C. § 1323(a), waives the sovereign immunity of federal facilities with respect to "all Federal, State, interstate, and local requirements, administrative authority, and process and sanctions respecting the control and abatement of water pollution." Moreover, under section 505(a)(1), 33 U.S.C. § 1365(a)(1), any citizen may commence a civil action against any person, including the United States, who is alleged to be in violation of an effluent standard or limitation or an order issued by EPA or a state with respect to such a standard or limitation. The term "effluent standard or limitation" includes NPDES permits issued under section 402, but does not include state standards that are not part of a permit. CWA § 505(f). As is the case with citizen suits under RCRA, a citizen suit under the Clean Water Act cannot be maintained unless the plaintiff has provided sixty days notice of its claims to the alleged violator, the State, and EPA.

As discussed earlier in the context of RCRA, waivers of sovereign immunity are to be interpreted narrowly, they are not to be implied, and they must be clear and unambiguous.

Count 12—NPDES Permit 78-232

■ McClellan's discharges to waters of the United States have been covered under a series of NPDES permits and state orders. A chronology of McClellan's permits is set forth in the Brunner Affidavit.

Count 12 of the complaint alleges that McClellan violated the provisions of NPDES permit 78-232 every day between July 1, 1981 and July 1, 1983 by discharging waste to surface water drainage courses from outfall pipes 001 and 002. In the memorandum in support of its motion for summary judgment, MESS concedes that permit 78-232 remained in effect only until September 24, 1982 and therefore alleges that violations occurred only during the period July 1, 1981 to September 24, 1982. MESS Memorandum at 5-6.

In its motion for summary judgment, the Government offers two separate grounds for dismissing Count 12. First, the Government maintains that this Court lacks jurisdiction under section 505 of the Clean Water Act—the citizen suit provision—because Count 12 alleges violations that occurred entirely in the past. Second, the Government argues that Count 12 is moot because McClellan no longer discharges waste to surface water drainage courses from outfalls 001 and 002. This Court agrees with both of the Government's contentions.

As previously discussed, the Supreme Court recently held in *Gwaltney* that a district court has jurisdiction over a claim under section 505 only if the complaint contains a good-faith allegation that the purported violations are of a continuous nature, *i.e.*, that there is a reasonable likelihood that a past polluter will continue to pollute in the future. Here, on its face, Count 12 alleges only past violations. Count 12 does not allege that McClellan is continuing to violate NPDES Permit 78-232; indeed, it could not since the permit expired by its own terms on July 1, 1983. Accordingly, under *Gwaltney*, this Court lacks jurisdiction with respect to Count 12.

Even if Count 12 did contain a good-faith allegation of a continuing violation, the issue is now moot in view of the uncontested evidence that McClellan now sends all of its domestic and industrial wastewater directly to the County waste treatment facility and no longer discharges any such wastewater to surface waters. Brunner Affidavit ¶ 19. As previously discussed, where "there is no reasonable expectation that the wrong will be repeated," 108 S.Ct. at 386, a claim should be dismissed as moot.

The Government's motion for summary judgment with respect to Count 12 is therefore granted and that count is dismissed with respect to injunctive relief. As was the case with Count 2, however, the Court is presently leaving open the possibility of granting declaratory relief with respect to Count 12. MESS' motion for summary judgment with respect to Count 12 is denied.

Count 13—Order No. 82–125

Count 13 alleges that McClellan violated Order No. 82–125 each and every day during the period May 1 to October 31 in 1983, 1984, and 1985 by discharging domestic wastewater to surface water or surface water drainage courses.

Count 13 must be dismissed on the same grounds as Count 12. First, Count 13 alleges past rather than continuing violations and therefore this Court lacks jurisdiction under the citizen suit provision of the Clean Water Act. Second, because it is undisputed that McClellan no longer discharges domestic wastewater to surface waters, Count 13 is moot. Accordingly, the Government's motion for summary judgment on Count 13 is granted except with respect to declaratory relief, and MESS' motion for summary judgment on Count 13 is denied.

Count 14—CWA § 301 (Stormwater Discharges)

■ Count 14 of the complaint alleges that McClellan discharges stormwater run-off into Magpie, Second, and Arcade Creeks without an NPDES permit and is therefore in violation of section 301 of the Clean Water Act. Without conceding any past violations, the Government argues that Count 14 should be dismissed both because McClellan's present permit explicitly encompasses stormwater discharges and because recent amendments to the Clean Water Act make it clear that McClellan need not presently apply for a permit for discharges consisting entirely of stormwater. The Court agrees.

McClellan's most recent NPDES permit was issued on September 25, 1987. That permit expressly encompasses stormwater, both in its title and in its imposition of monitoring and reporting requirements for discharges of stormwater.

In addition, EPA does not presently require permits for discharges consisting entirely of stormwater. See 50 Fed.Reg. 35,-200–03 (Aug. 29, 1985); 53 Fed.Reg. 4157 (Feb. 12, 1988). Moreover, section 405 of the Water Quality Act of 1987, Pub.L. No. 100–4, 101 Stat. 69, amended section 402 of the Clean Water Act and it is now evident that permits for industrial discharges consisting entirely of stormwater might not be required until as late as February 4, 1993. MESS contends that this amendment nevertheless requires McClellan to monitor its discharges of stormwater. Even if this were true, that is exactly what McClellan is doing pursuant to its current NPDES permit.

For these reasons, the Government's motion for summary judgment is granted with respect to Count 14 and that count is dismissed except for the possibility of declaratory relief. MESS' motion for summary judgment on Count 14 is denied.

Count 15—CWA § 301 (Discharges to Groundwater)

■ Count 15 alleges that McClellan is violating section 301 of the Clean Water Act by discharging hazardous substances from its waste pits to groundwater beneath the base without an NPDES permit.

Section 301(a) provides that in the absence of a permit, "the discharge of any pollutant by any person shall be unlawful." The term "discharge of a pollutant" is defined in section 502(12) as "any addition of any pollutant to navigable waters from any point source." The term "navigable waters," in turn, is defined in section 502(7) as "waters of the United States, including the territorial seas." Accordingly, section 301(a) requires permits for the addition of pollutants from point sources to waters of the United States.

The Clean Water Act does not on its face indicate whether groundwater constitutes "waters of the United States." Nevertheless, based upon the structure of the Act, its legislative history, and the relevant case law, this Court concludes that Congress did

not intend to require NPDES permits for discharges of pollutants to isolated groundwater. On the other hand, permits might be required for discharges to groundwater that has a direct hydrological connection to surface waters that themselves constitute "waters of the United States."

The structure of the Clean Water Act indicates that Congress did not intend groundwater and navigable waters to be synonymous. For example, in section 102(a), 33 U.S.C. § 1252(a), Congress directed EPA to "prepare or develop comprehensive programs for preventing, reducing, or eliminating the pollution of the *navigable waters and ground waters.*" (Emphasis added.) Of course, if "navigable waters" were the same as groundwater, it would have been unnecessary to refer to "ground waters" separately. *See also* CWA § 104(a)(5), 33 U.S.C. § 1254(a)(5); CWA 106(e)(1), 33 U.S.C. § 1256(e)(1).

The legislative history of the Clean Water Act also demonstrates that Congress did not intend that discharges to isolated groundwater be subject to permit requirements. The report accompanying the Senate version of the Clean Water Act stated:

Several bills pending before the Committee provided authority to establish Federally approved standards for groundwaters which permeate rock, soil and other surface formations. Because the jurisdiction regarding groundwaters is so complex and varied from State to State, the Committee did not adopt this recommendation.

S.Rep. No. 414, 92d Cong., 1st Sess. 73 (1971), U.S.Code Cong. & Admin.News 1972, pp. 3668, 3739, *reprinted in* 2 Congressional Research Service of the Library of Congress, *A Legislative History of the Water Pollution Control Act Amendments of 1972*, 93d Cong., 1st Sess., at 1491 (Comm.Print 1973) (hereinafter "Leg. Hist.").

In addition, the House specifically rejected an amendment introduced by Rep. Aspin that would have brought groundwater within the permitting and enforcement sections of the bill. 118 Cong.Rec. 10,669 (1972), 1 Leg.Hist. 597. In opposing this amendment, Rep. Clausen, a sponsor of the House bill, stated:

Mr. Chairman, in the early deliberations within the committee which resulted in the introduction of H.R. 11896, a provision for ground waters, similar to that suggested by the gentleman from Wisconsin, was thoroughly reviewed and it was determined by the committee that there was not sufficient information on ground waters to justify the types of controls that are required for navigable waters.

118 Cong.Rec. 10,667 (1972), 1 Leg.Hist. 590–91 (remarks of Rep. Clausen). Thus, both the Senate and the House specifically rejected attempts to require permits for discharges to groundwater under the NPDES program.

EPA, the agency charged with administering the NPDES program, has also taken the view that discharges to groundwater are not prohibited by section 301(a).[3] In an opinion dated December 13, 1973, EPA's Office of General Counsel ruled that EPA did not have general authority to regulate groundwater. Rather, according to the opinion, EPA's statutory authority to regulate discharges into the ground was limited to discharges into deep wells, and even then EPA could regulate only in conjunction with the regulation of discharges to surface waters.[4] Shortly after that opinion was issued, EPA promulgated regulations that reflected the General Counsel's interpretation. 38 Fed.Reg. 13,528 (May 22, 1973). *See* 40 C.F.R. § 125.26(a)(1) (1977). Subsequently, EPA eliminated even this narrow authority to regulate discharges

---

**3.** An agency's interpretation of a statute that it is charged with administering is entitled to considerable deference. *See Chemical Mfrs. Ass'n v. NRDC,* 470 U.S. 116, 125, 105 S.Ct. 1102, 1107, 84 L.Ed.2d 90 (1985); *Chevron, U.S.A., Inc. v. NRDC,* 467 U.S. 837, 843–44, 104 S.Ct. 2778, 2782, 81 L.Ed.2d 694 (1984).

**4.** The General Counsel's opinion is reproduced in full in *Exxon Corp. v. Train,* 554 F.2d 1310, 1320–21 n. 21 (5th Cir.1977).

into groundwater. 44 Fed.Reg. 32,854, 32,-870 (June 7, 1979).

In addition to the structure of the Clean Water Act, its legislative history, and EPA's interpretation of its scope, the pertinent case law also demonstrates that discharges to isolated groundwater are not prohibited by section 301(a). In a case directly on point, the western district of Michigan dismissed a count in a citizen suit that alleged that a federal facility had violated section 301(a) by discharging toxic chemicals into the ground without an NPDES permit. *Kelley v. United States*, 618 F.Supp. 1103 (W.D.Mich.1985). After analyzing the statutory scheme and reviewing the relevant legislative history, the court held that "Congress did not intend the Clean Water Act to extend federal regulatory and enforcement authority over groundwater contamination." *Id.* at 1107.

In *Exxon Corp. v. Train*, 554 F.2d 1310 (5th Cir.1977), the Fifth Circuit, while expressing no opinion as to whether EPA has jurisdiction over wastes that might " 'migrate' from groundwaters back into surface waters that concededly are within its regulatory jurisdiction," *id.* at 1312 n. 1, held that EPA did not have the authority to regulate discharges into deep wells as a condition to a permit that regulated discharges into navigable waters. *Id.* at 1329. *See also United States v. GAF Corp.*, 389 F.Supp. 1379, 1383 (S.D.Tex.1975) ("The disposal of chemical wastes into underground waters which have not been alleged to flow into or otherwise affect surface waters does not constitute a 'discharge of a pollutant' within the meaning of § 1311(a) [CWA § 301(a) ]") (footnote omitted).

MESS places its principal reliance on the Supreme Court's decision in *United States v. Riverside Bayview Homes, Inc.*, 474 U.S. 121, 106 S.Ct. 455, 88 L.Ed.2d 419 (1985). In that case, the Supreme Court upheld an interpretation by the Army Corps of Engineers that the Clean Water Act authorizes the Corps to require landowners to obtain permits before discharging fill material into wetlands adjacent to navigable bodies of water and their tributaries. In doing so, the Court stated that:

> the Act's definition of "navigable waters" as "the waters of the United States" makes it clear that the term "navigable" as used in the Act is of limited import. In adopting this definition of "navigable waters," Congress evidently intended to repudiate limits that had been placed on federal regulation by earlier water pollution control statutes and to exercise its powers under the Commerce Clause to regulate at least some waters that would not be deemed "navigable" under the classical understanding of that term.

*Id.*, 106 S.Ct. at 462. Based upon this language in *Riverside Bayview*, MESS asserts that the Clean Water Act plainly requires permits for discharges to groundwater.

*Riverside Bayview*, although indicating that Congress intended the term "navigable waters" to have broad scope, does not resolve this case. First, *Riverside Bayview* involved surface waters only; the site at issue was wetlands adjacent to bodies of water that were navigable in the traditional sense, not isolated groundwater. There the Corps had concluded that "wetlands adjacent to lakes, rivers, streams and other bodies of water may function as integral parts of the aquatic environment." *Id.* at 463. Isolated groundwater, obviously, serves no such function.

Moreover, in *Riverside Bayview* it was the reasonableness of the Corps' determination that the Clean Water Act requires permits for the filling of wetlands that was under review. In that context, the Court applied the well-established doctrine that "[a]n agency's construction of a statute it is charged with enforcing is entitled to deference if it is reasonable and not in conflict with the expressed intent of Congress." *Id.* at 461. Here, however, MESS advances an interpretation of the Clean Water Act that is directly contrary to the construction of that statute by the Agency charged with enforcing the NPDES pro-

gram.[5]

Whereas it is clear that Congress did not intend to require permits for discharges to isolated groundwater, it is also clear that Congress did mean to limit discharges of pollutants that could affect surface waters of the United States. In *Riverside Bayview*, for instance, the Court noted the importance of the Corps' conclusion that adjacent wetlands "may affect the water quality of adjacent lakes, rivers, and streams" by "serv[ing] to filter and purify water draining into adjacent bodies of water ... and ... slow[ing] the flow of surface run-off into lakes, rivers, and streams and thus prevent[ing] flooding and erosion." 106 S.Ct. at 463.

Other courts addressing the issue whether discharges to something other than "waters of the United States" are nonetheless covered by the NPDES program have also taken note of the ultimate effect on surface waters. *See Quivira Mining Co. v. United States Environmental Protection Agency*, 765 F.2d 126, 130 (10th Cir.1985) (noting that the discharges ultimately affected navigable-in-fact streams); *Exxon Corp. v. Train*, 554 F.2d at 1312 n. 1; *United States v. Phelps Dodge Corp.*, 391 F.Supp. 1181, 1187 (D.Ariz.1975) (holding that "navigable waters" includes "any waterway within the United States also including normally dry arroyos through which water may flow, where such water will ultimately end up in public waters such as a river or stream, tributary to a river or stream, lake, reservoir, bay, gulf, sea or ocean either within or adjacent to the United States"); *United States v. GAF Corp.*, 389 F.Supp. 1379, 1383 (S.D.Tex.1975) (holding that permits are not required for the "disposal of chemical wastes into underground waters which have not been alleged to flow into or otherwise affect surface waters").

Taking all these factors into consideration, the Court concludes that MESS should be given the opportunity to engage in additional discovery to demonstrate a hydrological connection between the groundwater that lies below McClellan's waste pits and surface waters that themselves constitute "navigable waters." Only if MESS can show that discharges from the waste pits have an effect on surface waters of the United States can it prevail on Count 15. The mere fact that the groundwater might ultimately be consumed or might be used for irrigation purposes, as asserted by MESS, is not enough to bring the alleged discharges within the parameters of the NPDES program. Rather, MESS must establish that the groundwater is naturally connected to surface waters that constitute "navigable waters" under the Clean Water Act.

Because further discovery is necessary with respect to Count 15, the cross-motions for summary judgment are denied.

**Counts 16, 17, 19, 20, and 21—State Water Claims**

Counts 16, 17, 19, 20, and 21 allege that McClellan has violated various state statutory and regulatory provisions.

MESS alleges in Count 16 that McClellan has violated section 13260 of the California Water Code. Section 13260 provides that "[A]ny person discharging waste ... that could affect the quality of the waters of the state" shall file a report with the regional water quality board. MESS contends that McClellan has violated this provision by discharging toxic chemicals from unlined pits on the base into the groundwater beneath the base without notifying the regional water quality control board.

MESS alleges in Count 17 that McClellan violated section 13264(a) of the California

---

**5.** MESS contends that because Congress defined "point source" to include wells, "Congress understood groundwater to be regulated under the Act." MESS Response at 32. But MESS is confusing "point source" and "navigable waters." Permits are required for discharges from point sources, not to point sources. Thus, the fact that a well is a point source has nothing to do with whether a permit is required for a discharge to the well; it only means that a discharge from the well, such as overflow into surface waters, might require a permit. Moreover, groundwater is not synonymous with wells. Thus, even if discharges to wells did require permits, it does not follow that discharges to groundwater would also require permits.

Water Code, which requires the filing of reports prior to the initiation or change of any discharge. MESS alleges that McClellan has frequently changed the nature of its discharges and initiated new discharges without filing the required reports.

In Count 19, MESS alleges a violation of section 13350 of the California Water Code, which requires compliance with regional and state discharge regulations. Specifically, MESS asserts that McClellan has not complied with section 64403 of title 22 of the California Administrative Code—which purportedly requires water suppliers to "protect the water resources" under their control and to "assure" a supply of potable water to users—by discharging hazardous substances to an aquifer under the base from which base personnel receive their drinking water. MESS further asserts that McClellan is not an "approved waste management unit" and therefore has violated section 2520 of title 23 of the California Administrative Code, which purportedly permits discharges of waste to land only at such approved waste management units.

Count 20 alleges a violation of section 5650 of the California Fish and Game Code. That provision prohibits the discharge into state waters of "[a]ny petroleum ... residuary product of petroleum, or carbonaceous material ... [and] [a]ny refuse, liquid or solid, from any ... chemical works [and] [a]ny substance or material deleterious to fish, plant life, or bird life."

Count 21 alleges a violation of section 5411 of the California Health and Safety Code, which prohibits the discharge of waste in any manner that will result in contamination, pollution, or nuisance.

The Government contends that the state statutory and regulatory provisions referred to in Counts 16, 17, 19(A), and 21 do not constitute "requirements" as that term is used in section 313 of the Clean Water Act, and therefore there has been no waiver of sovereign immunity with respect to these state provisions. The Government further maintains that this Court lacks jurisdiction over Counts 16, 17, 19, 20, and 21 under the citizen suit provision of the Clean Water Act because the state provisions involved in those counts are not "effluent standards or limitations" as defined in section 505 of the Act. The Court agrees with both elements of the Government's position.

*Section 313*

Section 313 waives sovereign immunity for "all Federal, State, interstate, and local requirements." The term "requirements" is not defined in the Clean Water Act; however, there is substantial case law that has given meaning to the term as used in section 313 and similar provisions of other environmental statutes. In short, these cases have interpreted "requirements" to refer to objective and administratively pre-established water pollution control standards; section 313 and similar provisions in other statutes do not allow for the enforcement against federal facilities of state laws that require an *ad hoc* establishment of standards of conduct by the judiciary.

When originally enacted in 1972, section 313 provided that federal facilities "shall comply with Federal, State, interstate, and local requirements respecting control and abatement of pollution to the same extent that any person is subject to such requirements." In a 1976 opinion construing section 313, the Supreme Court held that federal facilities were not required under section 313 to obtain pollution discharge permits from states. *EPA v. California ex rel. State Water Resources Control Board,* 426 U.S. 200, 96 S.Ct. 2022, 48 L.Ed.2d 578 (1976). A similar result was reached the same day with respect to the parallel immunity waiver of the Clean Air Act, section 118, 42 U.S.C. § 1857f (1976). *See Hancock v. Train,* 426 U.S. 167, 96 S.Ct. 2006, 48 L.Ed.2d 555 (1976).

In response to the Supreme Court's holding in *EPA v. California,* Congress amended section 313 in 1977 to make clear that federal facilities were subject to procedural as well as substantive requirements. However, Congress did not broaden the kinds of substantive requirements for which sovereign immunity was waived. Thus, both before and after the 1977 amendments, federal facilities were subject to state "re-

quirements ... respecting the control and abatement of water pollution." As the First Circuit stated in *Romero–Barcelo v. Brown*, 643 F.2d 835, 854 n. 36 (1981), *reversed on other grounds sub nom. Weinberger v. Romero–Barcelo*, 456 U.S. 305, 102 S.Ct. 1798, 72 L.Ed.2d 91 (1982), "[t]he apparent purpose of these amendments [to section 313] was to ensure the enforceability of the applicable substantive control requirements. We find no evidence that the amendments were intended to expand the category of applicable substantive requirements." *See also United States ex rel. TVA v. Tennessee Water Quality Control Board*, 717 F.2d 992, 997 (6th Cir. 1983), *cert. denied*, 466 U.S. 937, 104 S.Ct. 1909, 80 L.Ed.2d 458 (1984) ("the 1977 amendments did not change the extent to which section 313 waived immunity from state or local control; it merely made it clear that where federal agencies are subject to state or local regulation they must comply with state or local procedural as well as substantive requirements").

The term "requirements ... respecting the control and abatement of water pollution" has been construed narrowly by every court interpreting its scope. The Supreme Court indicated in *EPA v. California* that these "requirements" refer to the type of objectively quantifiable effluent limitations and standards set forth in sections 301, 302, 306, and 307 of the Clean Water Act, 33 U.S.C. §§ 1311, 1312, 1316, and 1317. *See* 426 U.S. at 215 n. 28, 96 S.Ct. at 2029 n. 28. In *State of New York v. United States*, 620 F.Supp. 374 (E.D.N.Y.1985), the court concluded that the substantive "requirements" of section 313 are coextensive with the "effluent standards or limitations" of section 505, *id.* at 383, and

that in order to fall within the waiver of section 313, a cause of action must relate to "an objective, administratively predetermined effluent standard or limitation or administrative order upon which to measure the prohibitive levels of water pollution." *Id.* at 384. In *Kelley v. United States*, 618 F.Supp. 1103 (W.D.Mich.1985), the court concluded that "requirements" in section 313 refers to "objective, quantifiable standards subject to uniform application." *Id.* at 1108.[6]

This Court agrees with the cases that have defined "requirements" to mean objective and administratively preestablished water pollution control standards. Even when the Court reads the complaint in the most liberal fashion, however, it finds that the state statutes and regulations involved in Counts 16, 17, 19A, and 21 of the MESS complaint fail to establish precise standards capable of uniform application. Count 16 involves a state statute that requires reports for discharges that "could affect the quality of the waters of the state." Count 17 involves an initiation or change in discharges. Count 19(A) involves a state regulation requiring that water suppliers "protect the water resources." And Count 21 involves a statute that prohibits discharges that result in "contamination," "pollution," or "nuisance." All of these provisions suffer from the same lack of precision and objectivity that led the courts in *State of New York* and *Kelley* to dismiss similar claims under the Clean Water Act. *See* 620 F.Supp. at 384–85; 618 F.Supp. at 1108.[7]

*Section 505*

▮ In any event, this Court lacks jurisdiction over Counts 16, 17, 19, 20, and 21

---

**6.** *See also Romero–Barcelo v. Brown*, 643 F.2d at 855 (interpreting similar "requirements" language in section 12 of the Noise Control Act, 42 U.S.C. § 4911, as meaning "relatively precise standards capable of uniform application"); *Department of Environmental Regulation v. Silvex Corp.*, 606 F.Supp. 159, 163–64 (M.D.Fla.1985) (giving similar interpretation to "requirements" in section 6001 of RCRA).

**7.** MESS contends that because the state statutes involved in Counts 16 and 17 require the filing of reports, they are "procedural" rather than "substantive" and therefore the cases defining

the specificity necessary to be a substantive requirement are not applicable to those counts. Normally, a reporting requirement is procedural rather than substantive. Here, however, the obligation to file reports is triggered by substantive standards that are extremely vague, *i.e.*, discharges that "could affect the quality of the waters" or that constitute "change." Because these substantive standards do not themselves constitute "requirements," it follows that federal facilities cannot be required to file reports based upon those vague standards.

because they do not allege violations of "effluent standards or limitations" as defined in section 505 of the Clean Water Act.

Section 505(a) of the Clean Water Act vests district courts with the following limited jurisdiction:

> Except as provided in subsection (b) of this section, and section 1319(g)(6) [CWA § 309(g)(6) ] any citizen may commence a civil action on his own behalf—
>
> (1) against any person ... who is alleged to be in violation of (A) an effluent standard or limitation under this chapter or (B) an order issued by the Administrator or a State with respect to such a standard or limitation ...
>
> \* \* \* \* \* \*
>
> The district courts shall have jurisdiction, without regard to the amount in controversy or the citizenship of the parties, to enforce such an effluent standard or limitation, or such an order ...

Thus, a district court's jurisdiction under section 505 is limited to the enforcement of an "effluent standard or limitation under this chapter." That term is defined in section 505(f):

> For purposes of this section, the term "effluent standard or limitation under this chapter" means (1) effective July 1, 1973, an unlawful act under subsection (a) of section 1311 of this title [CWA § 301(a) ]; (2) an effluent limitation or other limitation under section 1311 or 1312 of this title [CWA § 301 or 302]; (3) standard of performance under section 1316 of this title [CWA § 306]; (4) prohibition, effluent standard or pretreatment standards under section 1317 of this title [CWA § 307]; (5) certification under section 1341 of this title [CWA § 401]; *(6) a permit or condition thereof issued under section 1342 of this title [CWA § 402], which is in effect under this chapter (including a requirement applicable by reason of section 1323 of this title [CWA § 313])*; or (7) a regulation under section 1345(d) of this title [CWA § 405(d) ].

(Emphasis added.)

Thus, the only state law requirements that constitute enforceable effluent standards or limitations under section 505 are those that have been established administratively through the issuance of NPDES permits. This conclusion is supported by the legislative history of section 505. The Senate Report accompanying the 1972 amendments that included the private right of action under section 505 stated:

> Section 505 would not substitute a "common law" or court-developed definition of water quality. An alleged violation of an effluent control limitation or standard, would not require reanalysis of technological [or] other considerations at the enforcement stage. These matters will have been settled in the administrative procedure leading to the establishment of such effluent control provision. Therefore, an objective evidentiary standard will have to be met by any citizen who brings an action under this section.

S.Rep. No. 414, 92d Cong., 1st Sess. 79 (1971), U.S.Code Cong. & Admin.News 1972, pp. 3668, 3745, 2 Leg.Hist. 1497.

In *State of New York v. United States,* the court concluded, based upon the above legislative history: "[I]t is clear that Congress intended that § 505 would create a private right of action only to enforce effluent limitations and standards that are administratively predetermined through NPDES permits." 620 F.Supp. at 384. *See also United States v. Hooker Chemicals & Plastics Corp.,* 749 F.2d 968, 979 (2d Cir.1984) (" '[a]uthority granted to citizens to bring enforcement actions under [section 505] is limited to effluent standards or limitations *established administratively* under the Act' " (emphasis in original) (*quoting* S.Rep. No. 414, 92d Cong., 1st Sess. 81 (1971), U.S.Code Cong. & Admin.News 1972, pp. 3668, 3747); *Stream Pollution Control Board of Indiana v. United States Steel Corp.,* 512 F.2d 1036, 1041 (7th Cir.1975) (action to abate a nuisance is not actionable under section 505 since it is not an action commenced to require compliance with an effluent limitation, standard, or administrative order); *Town of North Hempstead v. Village of North Hills,* 482 F.Supp. 900, 904 (E.D.N.Y.1979) (action under section 505 "may only be maintained to enforce a previously promulgated effluent

standard or order of the Administrator of the EPA with respect to such a standard").

MESS relies upon the second part of the definition of "effluent standard or limitation" in section 505(f), which refers to "an effluent limitation or other limitation under section 1311 [CWA § 301] or 1312 [CWA § 302] of this title," in support of its position that the state provisions here fall within the scope of section 505. Section 301(b)(1)(C) requires the achievement of "any more stringent limitation, including those necessary to meet water quality standards, treatment standards, or schedules of compliance, established pursuant to any State law or regulations (under authority preserved by section 1370 of this title [CWA § 510])." According to MESS, sections 505(f)(2) and 301(b)(1)(C) together mean that "[a]ny state water quality law or regulation is enforceable against a federal facility under the citizen suit provision." MESS Response at 40.

This Court disagrees with MESS' reasoning. First, the provisions involved in Counts 16, 17, 19, 20, and 21 are not water quality standards. The term "water quality standards" is defined in 40 C.F.R. § 131.3(i) as "provisions of State or Federal law which consist of a designated use or uses for the waters of the United States and water quality criteria for such waters based upon such uses." [8] The state provisions involved in Counts 16, 17, 19, 20, and 21 do not designate the uses of water nor do they designate water quality criteria based on such uses.

Second, even if the state provisions were water quality standards, the Ninth Circuit recently held in *Oregon Natural Resources Council v. United States Forest Service*, 834 F.2d 842, 850 (9th Cir.1987), that "it is not the water quality standards

themselves that are enforceable in section 1311(b)(1)(C) [CWA § 301(b)(1)(C) ], but it is the 'limitations necessary to meet' those standards, or 'required to implement' the standards." Because water quality standards themselves are not enforceable under section 301(b)(1)(C), they cannot be "effluent standards or limitations" under section 505(f)(2).

Third, EPA has implemented section 301(b)(1)(C) through the NPDES program, by requiring that all NPDES permits include conditions necessary to achieve properly established state water quality standards. *See* 40 C.F.R. § 122.44(d)(1). Thus, if a state water quality standard has not been incorporated into an NPDES permit through an effluent limitation, it is outside the scope of section 301(b)(1)(C). Accordingly, a state water quality standard can constitute an effluent standard or limitation enforceable under section 505 only if it has been incorporated into an NPDES permit.

Fourth, state water quality standards must go through an elaborate approval procedure under section 303 of the Clean Water Act before they can be implemented through the NPDES program. The requirements and procedures for developing, reviewing, revising and approving water quality standards are set forth in 40 C.F.R. Part 131. There is no indication that any of the state provisions involved in Counts 16, 17, 19, 20, and 21 have gone through this formal approval process.

Fifth, MESS' interpretation of section 505(f)(2) is at odds with the legislative history of section 505 and the decisions that have held that an "effluent standard or limitation" must be administratively established.[9]

---

8. The Ninth Circuit described state water quality standards in *Sierra Club v. Union Oil Co. of California,* 813 F.2d 1480, 1489 (9th Cir.1987):

States establish water quality standards that specify the uses to be made of a body of water and the maximum levels of pollutants allowable in view of those uses. Water quality standards are designed to ensure the survival of wildlife in navigable waters and to protect recreational activities in and on the water. 33 U.S.C. § 1312(a) [CWA § 302(a) ]. In contrast with technology-based standards, which are

based on the feasibility of limiting effluent levels, water quality-based limitations relate to the environmental effects of different effluent levels.

9. One exception to the requirement that an effluent standard or limitation be administratively established is where a citizen suit alleges that a discharge of a pollutant is occurring without an NPDES permit. The definition of "effluent standard or limitation" in section 505(f)(1) includes "an unlawful act under subsection (a) of

Any doubt that citizen suits are limited to violations of NPDES permits where such permits exist is fully settled by section 402(k) of the Clean Water Act, which provides:

Compliance with a permit issued pursuant to this section shall be deemed compliance, for purposes of section ... 1365 of this title [CWA § 505], with sections 1311 [CWA § 301], 1312 [CWA § 302], 1316 [CWA § 306], 1317 [CWA § 307], and 1343 [CWA § 404] of this title, except any standard imposed under section 1317 [CWA § 307] of this title for a toxic pollutant injurious to human health.

Under this provision, if a discharger is in compliance with the terms and conditions of an NPDES permit, the discharger is deemed to be in compliance with section 301 of the Clean Water Act for purposes of a citizen suit. Section 301, of course, contains the reference to water quality standards relied upon here by MESS. Section 402(k) therefore provides clear evidence that "effluent standard or limitation" as defined in section 505(f) is not intended to include state water quality standards that have not been incorporated into an NPDES permit.

Because Counts 16, 17, 19, 20, and 21 do not allege violations of effluent standards or limitations, and because the provisions in Counts 16, 17, 19(A), and 21 do not constitute "requirements," the Government's motion for summary judgment is granted and each of those counts is dismissed. Moreover, MESS' motion for summary judgment with respect to Count 16 is denied.

Count 18—Water Code § 13376

Count 18 of the complaint alleges that McClellan has violated section 13376 of the California Water Code, which prohibits the "discharge of pollutants ... except as authorized." MESS alleges that McClellan has not received authorization to discharge pollutants to groundwater, to channel runoff from the base into water courses on the base, or to discharge unpermitted pollutants through outfall pipes regulated by its

NPDES permits. Count 18 is merely a restatement under state law of Counts 14, 15, and 22. Accordingly, the same rulings reached with respect to those counts will also apply to Count 18. Thus, insofar as it relates to stormwater, Count 18 is dismissed for purposes of injunctive relief but not declaratory relief. Insofar as Count 18 relates to discharges to groundwater, the Government's motion for summary judgment is denied so that MESS can engage in additional discovery. And insofar as it relates to discharges of volatile organic compounds, Count 18 is dismissed.

Count 22—CWA § 301 (Volatile Organic Compounds)

▆▆▆ Count 22 alleges that McClellan has violated section 301 of the Clean Water Act by discharging certain volatile organic compounds through outfall 001 without a permit. In its motion for summary judgment, MESS also alleges that McClellan has discharged volatile organics through its stormwater collection system. MESS contends that because McClellan's NPDES permits do not specifically allow McClellan to discharge volatile organics, such discharges are prohibited under section 301. The Court disagrees.

The California Regional Water Quality Board is well aware that McClellan has discharged small amounts of volatile organics into navigable waters. In fact, the Board has specifically required McClellan to report such discharges on a monthly basis, and it is undisputed that McClellan has consistently complied with that requirement. Yet, the state has never imposed an effluent limitation on volatile organics in any NPDES permit issued to McClellan. These facts combine to bring McClellan's discharges of volatile organics within the scope of its NPDES permit.

EPA's NPDES regulations, codified at 40 C.F.R. Part 122, contemplate that discharges of volatile organics will be addressed on a case-by-case basis. Section 122.21(g)(7)(ii) requires industrial permit applicants (such as McClellan) to report

---

section 1311 of this title [CWA § 301(a)]." Section 301(a) specifically prohibits discharges of

pollutants without permits.

quantitative data for volatile organics in each outfall containing process wastewater. Section 122.42(a) requires permittees to notify the permitting authority as soon as they know or have reason to believe that an activity has occurred or will occur that would result in the discharge of a toxic pollutant "which is not limited in the permit" in excess of specified levels. These sections are specifically made applicable to state NPDES programs through 40 C.F.R. § 123.25.

As these provisions make clear, discharges of volatile organics are not automatically prohibited just because they are not specifically allowed in an NPDES permit. Rather, NPDES applicants and permittees are required by regulation to keep the permit authorities fully informed of any past or potential discharges of volatile organics, and those authorities then determine the appropriate treatment of the discharges. McClellan has fully complied with this regulatory scheme. Furthermore, the state has never established a ban or even an effluent limitation for volatiles in McClellan's discharges. Brunner Affidavit ¶ 13.[10]

Under the circumstances, it is obvious that McClellan is not prohibited from discharging volatile organics. Accordingly, the Government's motion for summary judgment with respect to Count 22 is granted and MESS' corresponding motion for summary judgment is denied.

Count 23—NPDES Permits and Related Orders

Count 23 alleges that McClellan has exceeded effluent limitations on discharges of total coliform, chemical oxygen demand, pH, dissolved oxygen, bioassay, biochemical oxygen demand, and phenol. MESS' memorandum in support of its motion for summary judgment (at 7–9) and its statement of material facts not in dispute (at 9–35) allege additional violations with respect to total suspended matter, suspended solids, lead, temperature, turbidity, chlorine, and total cyanide.

The cross-motions for summary judgment raise two distinct issues. The first issue is whether MESS is entitled to relief with respect to alleged violations that were not included in the notice of intent to sue that MESS sent to McClellan, the State, and EPA. The second issue is whether MESS is entitled to summary judgment with respect to the alleged violations of receiving water standards, as opposed to effluent limitations.

*Violations Not Alleged in Notice of Intent to Sue*

MESS did not provide notice of its intent to sue with respect to effluent limitations and receiving water standards for total suspended matter, suspended solids, lead, temperature, turbidity, chlorine, and total cyanide. The Government therefore argues that MESS is not entitled to relief with respect to those pollutants.

There is a split in the circuits regarding the consequences of a failure to give adequate notice of intent to sue prior to the commencement of a citizen suit under the environmental statutes. The First, Sixth, and Seventh Circuits have construed the notice provisions strictly and have concluded that the failure to provide adequate notice deprives district courts of subject matter jurisdiction. *See Garcia v. Cecos International, Inc.,* 761 F.2d 76, 79 (1st Cir.1985); *Walls v. Waste Resource Corp.,* 761 F.2d 311, 316 (6th Cir.1985); *City of Highland Park v. Train,* 519 F.2d 681, 691 (7th Cir.1975), *cert. denied,* 424 U.S. 927, 96 S.Ct. 1141, 47 L.Ed.2d 337 (1976). The Second, Third, Eighth, and District of Columbia Circuits, by contrast, have adopted a "pragmatic" approach to the notice provisions. Under this approach, so long as sixty days have elapsed before the district court takes action, formal compliance with the terms of the notice provisions is not required. *See Natural Resources Defense Council v. Callaway,* 524 F.2d 79, 83–84 (2d Cir.1975); *Susquehanna Valley Alliance v. Three Mile Island,* 619 F.2d 231, 243 (3d Cir.1980), *cert. denied,* 449 U.S.

---

**10.** The new NPDES permit issued to McClellan on September 25, 1987 continues the past practice of requiring regular monitoring and reporting of volatile organic discharges, but, as before, does not impose any limitation on such discharges. Brunner Affidavit, Attachment 9.

1096, 101 S.Ct. 893, 66 L.Ed.2d 824 (1981); *Hempstead County & Nevada County Project v. EPA*, 700 F.2d 459, 463 (8th Cir.1983); *Natural Resources Defense Council v. Train*, 510 F.2d 692 (D.C.Cir. 1975).

The Ninth Circuit has recently sided with the courts that have taken a strict jurisdictional approach to the notice provisions. In *Hallstrom v. Tillamook County*, 831 F.2d 889 (9th Cir.1987), the Ninth Circuit determined that "proper notice" under the RCRA citizen suit provision "is a precondition of the district court's jurisdiction." 831 F.2d at 890. In so holding, the Court quoted approvingly the following passage from *Garcia v. Cecos Int'l, Inc.*, 761 F.2d at 78, 79:

> "The plain language of § 6972(b) [RCRA § 7002(b)] commands sixty days' notice before commencement of the suit. To accept anything less 'constitutes, in effect, judicial amendment in abrogation of explicit, unconditional statutory language.' ... *The notice requirement is not a technical wrinkle or superfluous formality that federal courts may waive at will.... [I]t is part of the jurisdictional conferral from Congress that cannot be altered by the courts.*"

831 F.2d at 891 (emphasis added). Although *Hallstrom* involved the RCRA citizen suit provision, its reasoning applies equally to the citizen suit provision in the Clean Water Act.

Even without *Hallstrom*, however, this Court would agree with those courts taking the jurisdictional approach. In this Court's view, concerns about sovereign immunity mandate that the will of Congress expressed in the notice provisions be particularly strictly enforced where the Federal government is the defendant in a citizen suit.[11]

Accordingly, MESS' motion for summary judgment with respect to total suspended matter, suspended solids, lead, temperature, turbidity, chlorine, and total cyanide is denied.

*Receiving Water Standards*

■■■ McClellan's NPDES permits draw a distinction between "effluent limitations" and "receiving water limitations." *See, e.g.*, Order No. 87–160, Attachment 9 to Brunner Affidavit. Effluent limitations specifically limit the quantity or concentration of a pollutant that may appear in McClellan's discharges from particular point sources. With respect to these effluent limitations, the Government concedes that it is bound by any exceedances that it reports in its discharge monitoring reports. Receiving water limitations, by contrast, provide that "the discharge shall not cause" certain changes in the receiving waters or certain levels in the receiving waters to be exceeded. The Government therefore contends that McClellan's reports indicating that certain changes occurred in the receiving waters or that certain levels were exceeded do not conclusively establish that the discharges "caused" those things to happen and therefore summary judgment in favor of MESS is inappropriate. The Court agrees.

McClellan's permits make it clear that receiving water standards constitute violations only if McClellan causes the change in water quality. McClellan's discharge monitoring reports do not indicate the "cause" of any of the alleged exceedances.

The Ninth Circuit's decision in *Sierra Club v. Union Oil Co. of California*, 813 F.2d 1480 (9th Cir.1987), is not to the contrary. In that case, the Ninth Circuit rejected Union Oil's defense based upon sampling errors and explained that self-monitoring reports constitute conclusive evidence of exceedances of permit limitations. Neither the Government nor this Court disagrees with the *Sierra Club* holding as far as it goes. But there is no indication that

---

11. MESS contends that it has "substantially complied" with the notice provisions because it gave sixty days notice of many of the violations alleged in its complaint. However, MESS' complete failure to make any reference at all to alleged violations regarding total suspended matter, suspended solids, lead, temperature, turbidity, chlorine, and total cyanide simply cannot satisfy the requirement that a notice of intent to sue include sufficient information to permit the recipient to identify "the specific standard, limitation, or order alleged to have been violated, the activity alleged to constitute a violation, the person or persons responsible for the alleged violation, the location of the alleged violation [and] the date or dates of such violation." 40 C.F.R. § 135.3(a).

the violations with respect to which Union Oil raised the sampling error defense involved anything other than effluent limitations imposed at particular point sources. Specifically, there is no reason to believe that Union Oil's defense pertained to receiving water standards that only prohibit a discharger from "causing" some change to occur. Moreover, the Government does not contend here that any of the information contained in McClellan's reports is erroneous; rather, it merely contends that those reports do not by themselves establish violations of the receiving water standards.

The Ninth Circuit also held in *Sierra Club* that as a matter of law Union Oil had violated the permit's prohibition on "creating conditions of visible oil in the receiving waters." *Id.* at 1491. MESS contends that such a prohibition is analogous to the receiving water standards in McClellan's permits. But Union Oil did not contend that it did not "cause" the visible oil in the receiving waters, nor did the five-day trial present any dispute on that fact. Rather, Union Oil made the legal argument that the permit's prohibition did not apply to receiving waters, but only to visible oil in San Pablo Bay. *Id.* The Ninth Circuit rejected this argument as a matter of law. Here, by contrast, the Government raises a factual issue regarding causation that cannot be rejected as a matter of law.

Accordingly, summary judgment is inappropriate at this time. By deferral of judgment on this issue, the Government will have an opportunity to develop and present evidence showing that its discharges did not cause the exceedances of receiving water standards.

*Effluent Limitation Violations*

The Government has conceded that McClellan exceeded effluent limitations for chemical oxygen demand, pH, and bioassay on certain dates. These exceedances are listed in Attachment 8 to the Brunner Affidavit. Summary judgment in favor of MESS is therefore granted with respect to the listed exceedances.

Attachment 8 does not list violations alleged by MESS that were not identified in its notice of intent to sue. For the same reasons discussed earlier, the exceedances identified in the complaint but not in the notice of intent to sue are dismissed.

In addition, MESS concedes that the chemical oxygen demand limitation on cooling water discharges and the receiving water standard for phenol did not come into effect until July 1, 1985. Accordingly, Count 23 is dismissed insofar as it alleges violations of such limitations prior to July 1, 1985. The parties disagree, however, whether the effluent limitation on chemical oxygen demand was in effect between July 1, 1985 and August 8, 1986. Therefore, the portion of Count 23 alleging violations of such limitation between those dates will be held open.

IT IS THEREFORE ORDERED THAT:

Based upon the above analysis, the Court decides the cross-motions for summary judgment as follows:

| Count | Order |
|-------|-------|
| 2 | Government motion granted with respect to injunctive relief for cooling towers; in all other respects, Government motion denied; MESS motion denied. |
| 3 | Government motion denied; MESS motion denied. |
| 4 | Government motion granted with respect to injunctive relief for cooling towers; in all other respects, Government motion denied; MESS motion denied. |
| 5 | Government motion granted with respect to waste drums; denied with respect to waste pits. |
| 6 | Government motion granted; MESS motion denied. |
| 8 | Government motion granted; MESS motion denied. |
| 9 | Government motion granted; |
| 10 | Government motion granted; MESS motion denied. |
| 11 | Government motion granted. |
| 12 | Government motion granted except with respect to declaratory relief; MESS motion denied. |
| 13 | Government motion granted except with respect to declaratory relief; MESS motion denied. |
| 14 | Government motion granted except with respect to declaratory relief; MESS motion denied. |
| 15 | Government motion denied; MESS motion denied. |
| 16 | Government motion granted; MESS motion denied. |
| 17 | Government motion granted. |
| 18 | Government motion granted with respect to volatile organic compounds; Government motion granted with respect to stormwater, except for declaratory relief; Government motion denied |

| Count | Order |
|---|---|
| | with respect to discharges to groundwater. |
| 19 | Government motion granted. |
| 20 | Government motion granted. |
| 21 | Government motion granted. |
| 22 | Government motion granted; MESS motion denied. |
| 23 | Government motion granted with respect to alleged violations of chemical oxygen demand limitation on cooling water discharges prior to July 1, 1985; Government motion granted with respect to alleged violations of receiving water standard for phenol prior to July 1, 1985; Government motion granted with respect to alleged violations of effluent limitations not identified in notice of intent to sue; Government motion denied with respect to alleged violations of chemical oxygen demand on cooling water discharges between July 1, 1985 and August 8, 1986. MESS motion denied with respect to total suspended matter, suspended solids, lead, temperature, turbidity, chlorine, and total cyanide; MESS motion denied with respect to receiving water standards; MESS motion granted with respect to effluent limitations for chemical oxygen demand, pH, and bioassay on the dates listed in Attachment 8 to the Brunner Affidavit; MESS motion denied with respect to remaining alleged violations of effluent limitations. |